599 So.2d 978 (1992)
Marshall Lee GORE, Appellant,
v.
STATE of Florida, Appellee.
No. 75955.
Supreme Court of Florida.
April 16, 1992.
Rehearing Denied July 6, 1992.
*980 Nancy A. Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Marshall Lee Gore appeals his convictions for first-degree murder, kidnapping, and robbery, and his sentence of death. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.
Susan Roark was last seen alive on January 30, 1988, in Cleveland, Tennessee, in the company of Marshall Lee Gore. Gore had planned to travel to Florida with a friend from Cleveland. While waiting for his friend at a convenience store, Gore struck up a conversation with Roark. Gore then entered Roark's car, a black Mustang, and they drove away.
Gore accompanied Roark to a party at the home of a friend of hers. Roark had planned to spend the night at her friend's home. Sometime between 11:30 and 12:00, Roark left to drive Gore home. She never returned. The following day Roark's grandmother reported her missing. She had been expected home by 7 a.m. that morning.
Gore arrived in Tampa on January 31, driving a black Mustang. He convinced a friend to help him pawn several items of jewelry later identified as belonging to Roark. Gore then proceeded to Miami, where police subsequently recovered Roark's Mustang after it was abandoned in a two-car accident. Gore's fingerprint was found in the car, as well as a traffic ticket which had been issued to him while he was in Miami.
On April 2, 1988, the skeletonized remains of Roark's body were discovered in Columbia County, Florida. The naked body was found in a wooded area which had been used as an unauthorized dumping ground for household garbage and refuse. Expert testimony established that the body was placed in its location either at the time of death or within two hours of death. The body could have been there anywhere from two weeks to six months prior to discovery. The forensic pathologist who testified for the State concluded that the cause of death was a homicide, given the situation in which the body was found and the fact that the neck area of the body was completely missing. The pathologist explained that this was probably due to some injury to the neck, such as a stab wound or strangulation trauma, which provided a favorable environment for insects to begin the deterioration process.
Gore was found guilty of first-degree murder, kidnapping, and robbery. The jury recommended a sentence of death by a vote of eleven to one, and the trial court followed this recommendation.
Gore's first claim on this appeal is that the trial court erred in denying his motion to suppress statements he made to the police. Gore was arrested in Paducah, Kentucky, on March 17, 1988, on federal *981 charges unrelated to this case. At this time, FBI agents informed Gore of his Miranda[1] rights. Gore signed a written waiver form, and the agents began questioning him. When the agents asked Gore how he arrived in Paducah, he stated that he didn't want to answer any more questions. The agents immediately ceased their interrogation and took Gore to a federal prison. Several days later, on March 24th, Gore was interviewed by detectives from the Metro Dade police department. At the start of this interview, Gore was again informed of his Miranda rights and waived them.[2] The detectives asked Gore various questions about his background and his knowledge of several crimes in the Miami area, as well as the Roark abduction. Gore made several statements at this time which were subsequently introduced at trial.[3]
Gore argues that he invoked his Fifth Amendment right to the assistance of counsel during police interrogations, thereby precluding any further questioning without the presence of counsel. Minnick v. Mississippi, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).[4] The only evidence offered in support of this assertion is the fact that Gore at some point consulted with federal public defenders. At the beginning of his interview with the Metro Dade detectives, Gore said that federal public defenders had advised him not to cooperate with law enforcement agencies. However, Gore went on to state that he declined to follow their advice, and that he wanted to speak to the police because he had done nothing wrong and had no need for an attorney.
The fact that Gore had been advised by an attorney at some point in his time in custody does not necessitate a finding that he invoked his Fifth Amendment right to counsel.[5] The FBI agents present at his interview in Kentucky specifically testified that Gore never requested an attorney. Their questioning was stopped because Gore wanted to get to the jail to call his father, not because he wanted the assistance of an attorney. The Metro Dade detectives also testified that Gore never requested an attorney, and that he declined their offer to call someone from the Miami public defender's office.[6] We therefore reject *982 Gore's claim that his statements were obtained in violation of his Fifth Amendment right to counsel.
While there is no credible evidence that Gore ever asserted his Fifth Amendment right to counsel, there is evidence that he asserted his Sixth Amendment right to counsel as to the federal charges. Before being questioned by state officials in Miami, Gore was brought before a federal magistrate. At this time, counsel was evidently appointed to represent him in the federal proceedings. Gore contends that because he was unquestionably represented by counsel, the police were prohibited from further interrogating him. However, the appointment of Sixth Amendment counsel is very different from a request for Fifth Amendment counsel to assist in police interrogations. As the Supreme Court recognized in McNeil v. Wisconsin:
The purpose of the Sixth Amendment counsel guarantee  and hence the purpose of invoking it  is to "protec[t] the unaided layman at critical confrontations" with his "expert adversary," the government, after "the adverse positions of government and defendant have solidified" with respect to a particular alleged crime. [U.S. v.] Gouveia, 467 U.S. 180, at 189, 104 S.Ct. [2292], at 2298 [81 L.Ed.2d 146 (1984)]. The purpose of the [Fifth Amendment] guarantee, on the other hand  and hence the purpose of invoking it  is to protect a quite different interest: the suspect's "desire to deal with the police only through counsel," Edwards [v. Arizona], 451 U.S. 477, at 484, 101 S.Ct. [1880], at 1884 [68 L.Ed.2d 378 (1981)].
___ U.S. ___, 111 S.Ct. 2204, 2208-09, 115 L.Ed.2d 158 (1991) (citations omitted).
The Court went on to hold that, while no further police-initiated interrogation on any offense can take place without the presence of counsel once the accused has invoked his Fifth Amendment right to have counsel present for questioning, the same is not true when an accused has made a request for counsel under the Sixth Amendment. While an accused may not be interrogated about the offense for which he has Sixth Amendment counsel, Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), he may be questioned about offenses for which the Sixth Amendment right has not attached. Therefore, although Gore did exercise his Sixth Amendment right to counsel on the federal charges, this did not prevent the state from questioning him on state charges.
We reject Gore's argument that this Court should not follow McNeil. We believe that the holding adopted by the Supreme Court in McNeil adequately protects the right to counsel, while at the same time recognizing that there is a difference between the appointment of counsel at a preliminary hearing such as first appearance and a request for counsel to assist in police interrogations, a difference which is also present under the Florida Constitution. See Traylor v. State, 596 So.2d 957 (Fla. 1992). Making the appointment of Sixth Amendment counsel the equivalent of a request for Fifth Amendment counsel would mean that the police could not question persons in custody about any offense once they have had some preliminary hearing at which Sixth Amendment counsel is routinely granted. As noted in McNeil:
The Sixth Amendment right to counsel attaches at the first formal proceeding against an accused, and in most States, at least with respect to serious offenses, free counsel is made available at that time and ordinarily requested. Thus, if we were to adopt petitioner's rule, most persons in pretrial custody for serious offenses would be unapproachable by police officers suspecting them of involvement in other crimes, even though they have never expressed any unwillingness to be questioned. Since the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good, society would be the loser.
*983 111 S.Ct. at 2210. The preclusion of interrogation in these situations is simply not mandated by the Constitution. Accordingly, finding no violation of Gore's rights under either the Fifth or the Sixth Amendment, we reject Gore's claim that the trial court erred in denying his motion to suppress.
Gore next claims that the trial court erred in admitting evidence of collateral crimes through the testimony of two witnesses, Lisa Ingram and Tina Corolis. Ms. Ingram was riding in a car with Gore on February 19 when she saw a woman's purse in the back seat. She testified that Gore stated that the purse belonged to "a girl that he had killed last night." Gore argues that this conversation referred to a murder that must have taken place on the 18th of February. Therefore, his statement could not be relevant to the murder of Roark, which took place on January 31, but was instead introduced solely to show criminal propensity  that Gore had committed a different murder.
We find that this testimony was admissible as an admission with regard to the Roark homicide. § 90.803(18), Fla. Stat. (1989). When Ingram was asked if she was sure about the time that Gore said, she stated that he said he killed a girl "last night or a few nights ago." Testimony had previously established that Roark had a purse with her on the night she disappeared. While there are some timing problems with this testimony, as well as a lack of connection between Roark's purse and the purse Ingram saw in the car, these were matters to be considered by the jury in evaluating the weight to give this testimony and did not render the evidence inadmissible.
The testimony of Tina Corolis was admitted as evidence of a collateral crime. Corolis was a casual acquaintance of Gore's, whom she knew as "Tony." In March of 1988, Gore called Corolis at her home and told her that his car had broken down and he needed a ride to it. After they had driven around for several hours, Gore revealed a knife, gained control of the car, and drove to a partially wooded dumping area off a dirt road. He put the knife to Corolis' stomach, forced her to undress, and raped her. He then dragged her out of the car, punched her face against a rock, strangled her, and stabbed her in the neck, arms, legs, and buttocks. Shortly thereafter Gore pawned several items of Corolis' jewelry and then proceeded to Kentucky in her car.
Similar fact evidence is generally admissible, even though it reveals the commission of another crime, as long as the evidence is relevant to a material fact in issue and is not admitted solely to show bad character or criminal propensity. Williams v. State, 110 So.2d 654, 662 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). Here, the State submitted evidence of the crimes committed against Tina Corolis in an effort to establish the identity of Roark's murderer, as well as to show Gore's intent in accompanying her that evening.
Gore argues that this case is comparable to Drake v. State, 400 So.2d 1217 (Fla. 1981), in that the collateral crime is not sufficiently similar to the crime at issue and the claimed similarities are not unique enough to qualify as evidence of identity. In Drake, the only similarity between the murder for which Drake was being tried and the collateral evidence of two sexual assaults was that in each case the victim's hands were bound behind her back and the victim had left a bar with the defendant. In rejecting the collateral crimes evidence as evidence of the identity of the murderer, we noted that "[a] mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations." Id. at 1219.
We find that the Corolis crime does have the required pervasive similarities. The significant common features of the two crimes include the following: The victim was a small female with dark hair; Gore introduced himself as "Tony"; he had no automobile of his own; he was with the victim for a lengthy amount of time before the attack began; he used or threatened to *984 use binding; the attack had both a sexual and pecuniary motive; the victim suffered trauma to the neck area; Gore transported the victim to the site of the attack in the victim's car; the victim was attacked at a trash pile on a dirt road, where the body was then left; Gore stole the victim's car and jewelry; he pawned the jewelry shortly after the theft; he fled in the victim's automobile, leaving the state where the victim was apprehended and staying with a friend or relative for a period of time after the crime; and he represented the car to be a gift or loan from a girlfriend or relative.
Gore argues that there are dissimilarities between the two incidents as well. In cases where there are significant dissimilarities between the collateral crime and the crime charged, the evidence tends to prove only two things  propensity and bad character  and is therefore inadmissible. See, e.g., Peek v. State, 488 So.2d 52, 55 (Fla. 1986); Drake, 400 So.2d at 1219. Here, however, the similarities are pervasive, and the dissimilarities insubstantial. This Court has never required the collateral crime to be absolutely identical to the crime charged. The few dissimilarities here seem to be a result of differences in the opportunities with which Gore was presented, rather than differences in modus operandi. See Chandler v. State, 442 So.2d 171, 173 (Fla. 1983). For example, the most significant difference between the two crimes  that Roark was murdered while Corolis was not  seems to be more of a fortuitous circumstance than a reflection of Gore's intent in the Corolis crime, since he beat her, stabbed her, and left her for dead in an isolated area.
Gore also argues that the similar features of the two crimes are not sufficiently unique to serve as evidence of identity. See Drake, 400 So.2d at 1219 (similar features of the crimes, binding of the victim's hands and meeting the victim at a bar, "not sufficiently unusual to point to the defendant in this case," and therefore irrelevant to prove identity). However, this Court has upheld the use of evidence of a collateral crime where the common points, when considered in conjunction with each other, establish a pattern of criminal activity which is sufficiently unique to be relevant to the issue of identity. Chandler, 442 So.2d at 173. While the common points between the Corolis assault and the Roark murder may not be sufficiently unique or unusual when considered individually, they do establish a sufficiently unique pattern of criminal activity when all of the common points are considered together. The cumulative effect of the numerous similarities between the two crimes is the establishment of a unique modus operandi which points to Gore as the perpetrator of the Roark homicide. We find no error in the admission of evidence of Gore's attack on Corolis.
On Gore's third point on appeal he argues that the trial judge erred in denying his motion for a continuance to secure the presence of a defense witness who was unable to travel to the trial due to her pregnancy. He also asserts error in the court's subsequent denial of his request to be present at the videotaped deposition of the witness. In this deposition the witness testified that she saw Susan Roark in Cleveland, in her black Mustang, on February 6, 1988.[7] This testimony directly contradicted the State's contention that Roark was murdered by Gore on the 31st of January.
The decision to grant or deny a continuance is within the sound discretion of the trial court. Magill v. State, 386 So.2d 1188, 1189 (Fla. 1980), cert. denied, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981). Here, the case had already been continued several times, and the defense was in fact able to present the testimony of the witness at trial in the form of the videotaped deposition. We find no abuse of discretion under these circumstances.
*985 Gore's claim that he had a right to be present at the deposition would have merit had the deposition been taken by the State to be used against him at trial. See State v. Basiliere, 353 So.2d 820 (Fla. 1977) (Confrontation Clause mandates presence of defendant where deposition will be admitted as substantive evidence against him at trial); Fla.R.Crim.P. 3.190(j)(3).[8] However, this deposition was neither taken on the application of the State nor used against Gore at trial. The deposition was introduced into evidence by Gore. While the deposition was ordered at the suggestion of the State, in order to get around the continuance problem, this was not a State deposition. The State would have been quite content if the defense had decided not to take the deposition at all, since this testimony directly contradicted the State's case. While a defendant does have the right to be present when a witness testifies against him, no rule of criminal procedure, statute, or judicial decision has ever expanded this right into a right to be present at the deposition of a defense witness, and we decline to do so now.
We also reject Gore's argument that this deposition falls under the defendant's right to be present "at the stages of his trial where fundamental fairness might be thwarted by his absence." Francis v. State, 413 So.2d 1175, 1177 (Fla. 1982). Depositions do not implicate the same concerns as trial testimony. While it is crucial for a defendant to be able to consult with his attorney at trial in order to aid him in conducting the examination of a witness, the same is not true of a deposition. Here, as in any deposition, if defense counsel had failed to pursue some avenue of questioning or missed some critical fact, he was fully able to go back and supplement the deposition after consultation with the defendant. Gore had no constitutional right to be present at the deposition of this witness, and we find no abuse of discretion in the court's decision to deny this request.
Gore next argues that the trial court erred in denying his motion for acquittal on the kidnapping count. Gore notes that testimony from Roark's friends indicated that at the time Roark left the party to take Gore home she accompanied him voluntarily, that she did not ask any of her friends to go along with her when she left, and that her friends would have been willing to go along had she asked. However, other evidence indicated that at some point Roark's accompaniment of Gore ceased to be voluntary. Roark planned to return to her friend's home to spend the night. She called her grandmother that evening and told her she would be home in time for church the next morning. When her body was found in Florida, there was a shoestring tied around her wrist, suggesting that at some point she had been bound. Although there is conflicting evidence on this issue, factual conflicts are to be resolved by the jury. State v. Smith, 249 So.2d 16, 18 (Fla. 1971). We find that there was substantial, competent evidence to support the jury's verdict of guilt as to the kidnapping charge, and we therefore reject Gore's argument that the trial judge should have granted his motion for acquittal.
Gore's fifth claim is that the trial court erred in excusing Susan Roark's stepmother from the rule of witness sequestration solely because she was a relative of the victim. Article I, section 16(b) of the Florida Constitution grants to the next of kin of homicide victims "the right to be informed, to be present, and to be heard when relevant, at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused." Art. I, § 16(b), Fla. Const. (emphasis added). This provision does not provide an automatic exception to the rule of sequestration. While in general relatives of homicide victims have the right to be present at trial, *986 this right must yield to the defendant's right to a fair trial.
The rule of witness sequestration is designed to help ensure a fair trial by avoiding "the coloring of a witness's testimony by that which he has heard from other witnesses who have preceded him on the stand." Spencer v. State, 133 So.2d 729, 731 (Fla. 1961), cert. denied, 369 U.S. 880, 82 S.Ct. 1155, 8 L.Ed.2d 283 (1962), and cert. denied, 372 U.S. 904, 83 S.Ct. 742, 9 L.Ed.2d 730 (1963). However, a defendant does not have an absolute right to exclude witnesses from the courtroom. "The trial judge is endowed with a sound judicial discretion to decide whether particular prospective witnesses should be excluded from the sequestration rule." Randolph v. State, 463 So.2d 186, 191 (Fla. 1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985). Of course, should the witness' presence cause some prejudice to the accused, the witness should not be allowed to remain in the courtroom. Where the rule has been invoked, a hearing should be conducted to determine whether a witness' exclusion from the rule will result in prejudice to the accused. Id. at 192.
In this case, although the trial judge did not hold a hearing to determine possible prejudice, he did hear argument from defense counsel on this issue before making his decision to exclude Ms. Roark. Counsel did not ask for any further proceeding, such as a proffer of testimony. In any event, the presence of Roark's stepmother in the courtroom during the trial did not prejudice Gore. Ms. Roark was not a material witness for the State; the extent of her participation at trial was her testimony that Susan usually wore several rings at one time and her identification of a necklace and four rings as similar to jewelry owned by Susan. We find no abuse of discretion in allowing this witness to be excluded from the rule of sequestration.
Gore's final arguments relate to the penalty phase of his trial. He first argues that the trial court erred by allowing the State to question a defense psychiatrist on the issue of Gore's mental state at the time of the offense. This witness testified on direct examination that Gore was not insane, but that his present behavior was a result of his upbringing, and that he had an antisocial personality disorder. On cross-examination, the State elicited testimony that Gore knew the difference between right and wrong, was capable of understanding the nature and quality of his acts, and was capable of conforming his conduct to the requirements of the law. This testimony, designed to show Gore's ability to be responsible for his own actions, was relevant to rebut the defense's mitigating evidence that Gore was merely the product of his upbringing. We find no abuse of discretion in allowing this testimony to be elicited.
Gore next disputes the trial judge's findings at sentencing. The court found the following as aggravating circumstances: (1) Gore had previously been convicted of other violent felonies; (2) the murder was committed while Gore was engaged in a kidnapping; (3) the murder was committed for financial gain; and (4) the murder was cold, calculated, and premeditated.[9] In mitigation the judge considered evidence of Gore's poor childhood and antisocial personality, concluding that this was insufficient mitigation to outweigh the aggravating circumstances. Gore does not dispute the finding that the murder was committed for financial gain, but argues that the remaining aggravating circumstances were improperly found.
Gore first argues that the trial court erred in finding the murder to have been committed in a cold, calculated, and premeditated manner. To establish the heightened premeditation necessary for a finding of this aggravating factor, the evidence must show that the defendant had "a careful plan or prearranged design to kill." Rogers v. State, 511 So.2d 526, 533 (Fla. 1987) (emphasis added), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). See also Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990), cert. denied, ___ U.S. *987 ___, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); Rivera v. State, 561 So.2d 536, 540 (Fla. 1990). Here, the evidence established that Gore carefully planned to gain Roark's trust, that he kidnapped her and took her to an isolated area, and that he ultimately killed her. However, given the lack of evidence of the circumstances surrounding the murder itself, it is possible that this murder was the result of a robbery or sexual assault that got out of hand, or that Roark attempted to escape from Gore, perhaps during a sexual assault, and he spontaneously caught her and killed her. There is no evidence that Gore formulated a calculated plan to kill Susan Roark. We therefore conclude that the State has failed to establish the existence of this aggravating circumstance beyond a reasonable doubt. See Drake v. State, 441 So.2d 1079, 1082-83 (Fla. 1983), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984); Mann v. State, 420 So.2d 578, 581 (Fla. 1982).
Gore's arguments as to the remaining aggravating factors are without merit. In finding that Gore had previously been convicted of violent felonies, the trial judge considered convictions which have since been affirmed on appeal, see Gore v. State, 573 So.2d 87 (Fla. 3d DCA), review denied, 583 So.2d 1035 (Fla. 1991), thereby negating Gore's argument on this issue. We also reject Gore's argument as to the finding that the murder was committed during a kidnapping. As discussed previously, there was substantial, competent evidence to support the kidnapping charge.
Having concluded that one of the aggravating factors was improperly found, we must address the effect of this error by examining the remaining aggravating and mitigating circumstances. As nonstatutory mitigating evidence[10] the defense presented the testimony of Gore's uncle and mother, who testified that Gore's father was verbally and physically abusive and set a poor example by proudly engaging in criminal activities. Most of the father's physical abuse was directed at Gore's mother. The defense also presented the testimony of a psychiatrist who concluded that Gore was a product of his upbringing and had an antisocial personality disorder. In considering the mitigating evidence, the trial judge noted that Gore was rational and possesses above average intelligence, that he participated in legal arguments and defenses,[11] and that the defense psychiatrist specifically testified that Gore had the ability to conform his conduct to the law.
In contrast to this mitigation we must consider the three remaining aggravating circumstances, as well as the jury's recommendation of death. Under the facts of this case, there is no reasonable possibility the trial court would have concluded that the three valid aggravating factors were outweighed by the mitigating evidence. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986). We therefore conclude that the trial court would have imposed the same sentence without the finding that the murder was cold, calculated, and premeditated, and that the erroneous finding of this factor was harmless beyond a reasonable doubt.
For the reasons expressed, we affirm Gore's convictions and sentence of death.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, GRIMES and HARDING, JJ., concur.
BARKETT, J., concurs in result only with an opinion, in which KOGAN, J., concurs.
KOGAN, J., concurs in result only with an opinion.
*988 BARKETT, Judge, concurring in result only.
For the reasons expressed in my opinion in Traylor v. State, 596 So.2d 957 (Fla. 1992) (Barkett, J., concurring in part, dissenting in part), I dissent from the portion of the majority opinion that adopts the "rationale" and holding of McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). I concur in the result, however, because I believe the admission of Gore's exculpatory statements in this case was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).
The facts pertaining to this issue are relatively simple. Gore was arrested in Kentucky on a federal parole violation and subsequently transported to Miami. Before being turned over to state authorities, Gore was brought before a federal magistrate, at which point counsel was appointed to represent him and at which point, as the majority recognizes, Gore exercised his Sixth Amendment right to counsel.[12]
Nevertheless, the majority determines that even though Gore exercised his Sixth Amendment right to counsel, the police were not thereafter prohibited from questioning Gore while he was in custody regarding the state murder charges because Gore had only invoked his right to counsel with respect to the federal charges. Although I agree that the purposes and extent of the Fifth and Sixth Amendment rights to counsel differ in some respects, I find this "charge specific" argument unpersuasive in the context of police-initiated custodial interrogation.[13]
The majority acknowledges that where an accused invokes the Fifth Amendment right to counsel, no further police-initiated custodial interrogation can occur without the presence of counsel. Majority op. at 982; art. I, § 9, Fla. Const.; see Traylor, at 966. However, the majority finds that because Gore did not specifically refer to the Fifth Amendment when he asked for counsel at the first appearance hearing, "there is no credible evidence that Gore ever asserted" it. Majority op. at 982.[14]
The majority thus agrees with McNeil that there is a difference between requesting "counsel at a preliminary hearing such as a first appearance [Sixth Amendment] and a request for counsel to assist in police interrogations [the Fifth Amendment]." Majority op. at 982. However, as I stated in Traylor, any such arbitrary distinction between two separate guarantees of the same right  the right to have a lawyer's assistance in dealing with the power of the state during custodial interrogation  makes no sense.[15]
The "rationale" set forth in McNeil for distinguishing the Fifth and Sixth Amendment rights to counsel is nonexistent. The McNeil majority writes that:

The purpose of the Sixth Amendment counsel guarantee  and hence the purpose of invoking it  is to "protec[t] the unaided layman at critical confrontations" with his "expert adversary," the government, after "the adverse positions of government and defendant have solidified" *989 with respect to a particular alleged crime.
111 S.Ct. at 2208-09 (citations omitted) (some emphasis added). The McNeil majority then states:

The purpose of the [Fifth Amendment] guarantee, on the other hand  and hence the purpose of invoking it  is to protect a quite different interest: the suspect's "desire to deal with the police only through counsel."

Id. at 2209 (citation omitted) (emphasis added). McNeil's conclusion that the Fifth and Sixth Amendments differ with respect to custodial interrogation is anything but self-evident. The reason given by the McNeil majority for invoking Sixth Amendment counsel  to protect the unaided laymen at critical confrontations with the government  is exactly the same reason given for invoking the Fifth Amendment right to counsel: the desire to deal with the police only through counsel. Surely, the police are part of the "government" and police interrogation of an accused is a "critical confrontation." Thus, the Fifth Amendment right to counsel is necessarily a subset of the Sixth Amendment right to counsel in the context of custodial interrogation. Therefore, if Sixth Amendment counsel is invoked to aid in "critical confrontations with the government," then quite clearly Fifth Amendment counsel  which is invoked for protection against the police during custodial interrogation  is included within that invocation. In sum, the two rights to counsel are coextensive, at least with respect to custodial interrogation.
Perhaps in recognition of its forced logic, the McNeil majority concedes that the reason for its strained legal conclusion is to allow police access to those accuseds who have not been released on bail so that the police can conduct further interrogations.[16]See 111 S.Ct. at 2210. But such "reasoning," to which the majority of this Court subscribes, is neither reasoned nor fair.[17] To the contrary, it underscores and approves the discriminatory application of our criminal laws. The only accuseds who are sitting in jail after a first appearance, and hence subject to custodial interrogation without lawyers, are those who are indigent and therefore too poor to post bail. Defendants with financial resources can hire their own lawyers and post immediate bail. Thus, any questioning of these accuseds, if it takes place at all, will not take place in the coercive atmosphere of a jail.
Today's decision not only discriminates against those who are poor, but also discriminates against those who are uneducated and those who are unfamiliar with legal terminology. The McNeil majority made clear that should an accused add the magic words, "I `desire ... the assistance of an attorney in dealing with custodial interrogation by the police,'" see McNeil, 111 S.Ct. at 2209, the accused would acquire the protections under both the Fifth and Sixth Amendments. Consequently, those educated defendants conversant with McNeil (and now Gore) would know to add these magic words which would insulate *990 them from being approached (and reapproached) in their cells for interrogation. But the unrepresented and uneducated who simply say, "I need a lawyer and cannot afford to hire one," would not be insulated from being constantly approached in their cells without their lawyers' presence. As the Michigan Supreme Court eloquently explained in People v. Bladel:
Although judges and lawyers may understand and appreciate the subtle distinctions between the Fifth and Sixth Amendment rights to counsel, the average person does not. When an accused requests an attorney, either before a police officer or a magistrate, he does not know which constitutional right he is invoking; he therefore should not be expected to articulate exactly why or for what purposes he is seeking counsel. It makes little sense to afford relief from further interrogation to a defendant who asks a police officer for an attorney, but permit further interrogation to a defendant who makes an identical request to a judge. The simple fact that [the] defendant has requested an attorney indicates that he does not believe that he is sufficiently capable of dealing with his adversaries singlehandedly.
421 Mich. 39, 365 N.W.2d 56, 67 (1984), aff'd sub nom. Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (quoted in McNeil, 111 S.Ct. at 2213 (Stevens, J., dissenting)).
It is a meaningless and cruel game to tell indigent and usually uneducated defendants that they are entitled to a state-paid lawyer, but only if they can guess the right way to ask for one.[18] Under McNeil and the majority's holdings today, indigent incarcerated accuseds need lawyers to tell them how to ask for a lawyer in order to fully enjoy the right to a lawyer's assistance in the first place.
Regrettably, today's decision comes on the heels of this Court's release of the Racial and Ethnic Bias Study Commission Report, "Where the Injured Fly for Justice." Report and Recommendations of the Florida Supreme Court Racial and Ethnic Bias Study Commission (December 11, 1991) (on file with the Office of the State Courts Administrator). The interrelation of minority status and poverty further means that today's opinion will give police a coercive and unfair advantage over a specific class of defendants  uneducated and indigent minorities.
The majority's adoption of McNeil and its discriminatory impact on indigent minorities is even more disappointing in light of the Court's statement in Traylor that "[t]he Equal Protection Clause of our state Constitution was framed to address all forms of invidious discrimination under the law, including any persistent disparity in the treatment of rich and poor." Traylor, at 969 (footnote omitted). The right to court-appointed counsel is supposed to be the basic mechanism which converts this rhetoric of "justice for all" and "equal access to courts" into a semblance of reality. The proclamation in Traylor that "[e]ach Florida citizen  regardless of financial means  stands on equal footing with all others in every court of law throughout our state," at 969, is sadly untrue.
KOGAN, J., concurs.
KOGAN, Judge, concurring in result only.
I fully concur in Justice Barkett's comments. I add only that I cannot accept the majority's analysis for the same reasons expressed in my partial dissent to Traylor v. State, 596 So.2d 957 (Fla. 1992) (Kogan, J., concurring in part, dissenting in part).
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Gore refused to sign a written waiver of his rights at this interview, stating that he did not want to sign anything. This is not dispositive to a finding of a valid waiver. See North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).
[3] Gore stated that he did not recall whether he had ever driven a black Mustang with Tennessee license tags and that he had never met Susan Roark before in his life. He also denied any knowledge relating to another attack which subsequently resulted in his conviction on several charges. Evidence of this incident was introduced at trial as similar fact evidence.
[4] Although Gore contends that he invoked this right while in federal custody, this request would have precluded questioning on state charges as well. See Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).
[5] Gore did exercise his Fifth Amendment right to remain silent while being interrogated by federal officials. However, this did not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject." Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). The test for determining the voluntariness of statements made after the exercise of the right to remain silent is whether the right to cut off questioning has been "scrupulously honored." Id. at 104, 96 S.Ct. at 326. Gore's rights were so honored here. The FBI immediately stopped the interrogation when Gore said he did not want to answer further questions. Questioning by state officials took place seven days later, after Gore was again informed of his Miranda rights and waived them.
[6] We acknowledge that Gore's testimony at the suppression hearing contradicted that of the Metro Dade detectives. Gore stated that he was interrogated by these detectives from 3:15 p.m. until 1 a.m. and that the only statement he made, in response to every single question, was "I want an attorney, I want a phone, and I want to go to the bathroom." He claimed that the information the police obtained during this interview was gleaned from a federal presentence investigation. This incredulous testimony does not provide a basis for overturning the trial court's finding that Gore's statements were voluntary.

We also note that evidence was offered at the suppression hearing that an attorney from the Dade County public defender's office sought access to Gore while he was being questioned, eventually obtaining a court order to be allowed to see him. This evidence has no bearing on the issue of whether Gore requested counsel. The attorney was not present because of a request by Gore, but because she heard about him on a television news story. When Gore was informed that the attorney was present, he declined to speak with her.
[7] We note that the State effectively called this testimony into question by the testimony of a rebuttal witness who saw Roark under the exact same circumstances as the defense witness, but remembered that the date was January 30, and that Roark indicated she was on her way to a party with some friends.
[8] This rule provides in pertinent part:

(3) If the deposition is taken on the application of the State, the defendant and his attorney shall be given reasonable notice of the time and place set for the deposition. The officer having custody of the defendant shall be notified of the time and place and shall produce the defendant at the examination and keep him in the presence of the witness during the examination.
[9] § 921.141(5)(b), (d), (f), (i), Fla. Stat. (1987).
[10] Gore argued that his age at the time of the crime, twenty-four, was a statutory mitigating factor. In rejecting this argument, the judge noted that Gore was streetwise, had completed two years of high school, and was of average or above intelligence. We find substantial competent evidence to support the trial court's rejection of this mitigating circumstance. See Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990).
[11] Gore even conducted the cross-examination of one of the State's witnesses, Tina Corolis.
[12] I use the terms "Fifth" and "Sixth" Amendment, as opposed to "article I, section 9" and "article I, section 16" for purposes of consistency with the majority opinion. I note that under the doctrine of primacy announced in Traylor v. State, 596 So.2d 957, 962-963 (Fla. 1992), I would have first analyzed Gore's rights under the Florida Constitution before turning to federal constitutional law.
[13] The phrase "charge specific" refers to the argument that invocation in a judicial proceeding of the Sixth Amendment right to counsel as to one charge imposes no restrictions on police inquiry as to separate charges for which the right has not attached. See McNeil v. Wisconsin, ___ U.S. ___, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); Traylor, at 968 & n. 31.
[14] Because Gore exercised his article I, section 16/Sixth Amendment right to counsel, I would hold that Gore also invoked his article I, section 9/Fifth Amendment right to counsel with regard to custodial interrogation and therefore would find that the police, both federal and state, were prohibited from conducting a custodial interrogation outside the presence of Gore's attorney.
[15] Once again, as a point of clarification, I am saying that the Sixth Amendment is not charge specific with regard to custodial interrogation although it may indeed be charge specific in other contexts as to which there is yet no prosecution.
[16] I agree with Justice Stevens's observation that the "decision will have little, if any, practical effect on police [interrogation] practices" because defense lawyers will now simply clarify at first appearances that the right to counsel is also being invoked for purposes of custodial interrogation by the police. McNeil, 111 S.Ct. at 2212 (Stevens, J., dissenting).
[17] The majority seems to fear that providing lawyers to defendants in custody will somehow hamper effective law enforcement by eliminating custodial confessions. Similar arguments were discounted by the United States Supreme Court in its landmark decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court predicted that "[t]he limits we have placed on the interrogation process should not constitute an undue interference with a proper system of law enforcement." Id. at 481, 86 S.Ct. at 1631. Subsequent studies concluded that there was no substantial reduction in confessions as a result of informing suspects of their "Miranda rights." Charles J. Ogletree, Are Confessions Really Good for the Soul? A Proposal to Mirandize Miranda, 100 Harv.L.Rev. 1826, 1827 & n. 5 (1987); see e.g., Special Project, Interrogations in New Haven: The Impact of Miranda, 76 Yale L.J. 1519, 1613 (1967); Stephen J. Schulhofer, Reconsidering Miranda, 54 U.Chi.L.Rev. 435, 455-460 (1987). But see Stephen J. Markman, The Fifth Amendment and Custodial Questioning: A Response to "Reconsidering Miranda", 54 U.Chi.L.Rev. 938, 945-948 (1987) (arguing that the empirical studies were flawed).
[18] Ironically, the police have not been held to such a strict standard in advising suspects of their Miranda rights, and courts have consistently held that no magic words are needed. See, e.g., California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981); State v. Delgado-Armenta, 429 So.2d 328, 329-31 (Fla. 3d DCA 1983).