[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-11522

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 20, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-00474-CV-HLA

MARS L. GORE,
a.k.a. Marshall Lee Gore,

Petitioner-Appellant,

versus

SECRETARY FOR THE DEPARTMENT
OF CORRECTIONS,
ATTORNEY GENERAL OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

(July 20, 2007)

Before TJOFLAT, CARNES, and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

On March 14, 1990, a jury in the Circuit Court for Columbia County, Florida, found petitioner Mars L. Gore guilty of the murder, kidnapping, and robbery of Susan Roark, and recommended that he be sentenced to death. Three weeks later, the court accepted the jury's recommendation and imposed the death sentence. After exhausting his state remedies, Gore, proceeding under 28 U.S.C. § 2254, petitioned the United States District Court for the Middle District of Florida for a writ of habeas corpus. The court denied his petition. After the district court denied his application for a certificate of appealability, Gore applied to this court for a certificate. We granted his application and issued a certificate of appealability for a single issue: Whether the Florida Supreme Court's decision upholding the trial court's refusal to suppress certain statements Gore made to detectives in the Metro-Dade Police Department infringed his rights under the United States Constitution. The district court, in denying habeas relief, held that the Florida Supreme Court's decision on this issue was neither based on an unreasonable determination of the relevant facts nor contrary to or an unreasonable application of established federal law. Because we agree, we now affirm.

I.

A.

On Saturday, January 30, 1988, Susan Roark told her grandmother, with whom she lived, that she was going to a party thrown by her friend Michelle Trammell at Trammell's trailer home just outside of Cleveland, Tennessee. Roark, a student at nearby Cleveland State University and a close friend of Trammell's, arrived at the party some time between nine and ten in the evening. She was accompanied not by her expected date – who had car troubles – but by a man she had met at the Rocky Top Market in Cleveland on her way to the party. She introduced him to the others at the party as "Tony." A couple hours later, Roark, who planned to spend the night at Trammell's, left the party to drive "Tony" back into Cleveland. Roark had asked Trammell to come with her, but when Trammell fell asleep, Roark decided to take "Tony" back into town on her own. They left the party around midnight in Roark's black 1986 Ford Mustang GT. Roark did not return and was never heard from again.

Roark did not show up for church the next morning, January 31, as she had promised her grandmother she would. When she did not return by Sunday afternoon, her family became concerned. They began trying to track Roark down

by calling several of her friends, including Trammell.[1]  When these efforts ultimately proved futile, Roark's family reported her missing to the Cleveland police.

B.

The Cleveland Police Department launched a missing person investigation headed up by Detective Dewey Chastain.  Police interviewed Roark's friends and acquaintances and began combing the area of Bradley County near Trammell's trailer.  They issued a "BOLO" ("Be on the Lookout") to local law enforcement agencies placing them on notice of the search for Roark, and providing them with information about her and her car.  The Mustang's license plate number was entered into the National Crime Information Center ("NCIC") database – ensuring that should the car be stopped by law enforcement anywhere in the country, the car would be flagged when the officer ran the plates through the computer.[2]

---

[1] Trammell initially lied to Ruth Roark, Susan's grandmother, telling her that Susan had spent the night at Trammell's trailer as she had planned.  After discussing the matter with her boyfriend, she called Ruth Roark back and apologized.  She then explained that Susan had left the party with a man Trammell did not know.

[2] When the Cleveland police entered the Mustang's license plate number into the NCIC, they classified the car as "stolen."  Several days later, the Cleveland police decided that it was premature to call the car "stolen" – there was insufficient evidence at the time that Roark had not voluntarily left town with the car – so they withdrew the license plate number from the NCIC database.  Around February 10, 1988, the Cleveland police reentered the plate number into the NCIC system as part of a missing person's file.  The officer entering the information this second time mis-entered the license plate number.  As things turned out, this error would have tragic consequences.

4

Roark had given Trammell and the other partygoers the address of a house in Cleveland where she was taking "Tony." Trammell passed this information on to Chastain, and, around February 10, he went to the address and interviewed Brenda Gore. Brenda Gore told Chastain that her son, Mars Gore, had recently been in Cleveland visiting her. Mars Gore resided in Miami, and he had been released from federal prison in Florida after serving time for a firearms conviction. She provided Chastain with pictures of her son, and Trammell and the others at her party all positively identified the man in the pictures as "Tony" – the man with whom Roark had left the party.

On February 11, the Cleveland police used the local media to publicly solicit information regarding Roark's disappearance. They asked that anyone with any knowledge of Roark's whereabouts come forward. The solicitations indicated that there was a prime suspect in the disappearance, but stopped short of giving Mars Gore's name.

Early in the morning on Sunday, February 14, 1988, a black Ford Mustang GT collided with another car in Miami, Florida. The Mustang's driver fled the scene on foot, and the Miami police department had the car towed to an impound lot. The registration in the glove compartment identified the owner as Harold Roark – Susan Roark's father. A traffic citation found inside the car had been

5

issued to a Marshall Lee Gore.[3]

The discovery of the Mustang in South Florida indicated that, if Roark been abducted, it was likely that she was transported across state lines.  As such, the Federal Bureau of Investigation ("FBI" or "the Bureau") opened a potential kidnapping file[4] and joined the investigation into Roark's disappearance.  While agents in Tennessee assisted the Cleveland Police in their search for any sign of Roark, agents in South Florida were alerted to be on the lookout for Mars Gore.

In early March, after receiving a call from the Knoxville, Tennessee office of the FBI, Agent James Barrow of the Bureau's Tampa, Florida office, began investigating a possible connection between Gore and a University of Tampa student, Susan Brown.  Brown had attended high school in Miami with Mars Gore, and the two had dated for a time.  Barrow interviewed Brown and learned from her: that Gore had stayed with her in Tampa in January, prior to traveling on to Cleveland, Tennessee, to visit his mother; that Gore had visited her, unexpectedly, in Tampa on January 31, 1988, the day after Roark's disappearance; that Gore had arrived driving a black Ford Mustang; and that, together, Brown and Gore had pawned at several different pawn shops some items of jewelry Gore had in his

---

[3] The citation had been issued in Dade County on February 11, 1988.

[4] A kidnapping that affects interstate commerce is a federal crime under 18 U.S.C. § 1201(a)(1).

6

possession. Agent Barrow visited the pawn shops described by Brown and recovered the jewelry. On March 11, Barrow learned from Brown that Gore was staying in the Miami area with a friend of Brown's named Rosa Lastinger.

Meanwhile, the U.S. Marshals Service was also searching for Mars Gore.[5] On March 12, 1988, a deputy U.S. Marshal visited Gore's father's construction site in Miami and asked to speak to Gore. Gore was serving a five-year term of probation handed down by the U.S. District Court for the Southern District of Florida for having been convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 924(a).[6] The district court had issued a warrant for Gore's arrest on February 24, 1988 for violating the conditions of his probation.[7] Gore had given his probation officer his father's construction site as his place of

---

[5] There is no indication in the record that the U.S. Marshals Service and the FBI were working in concert to locate Gore.

[6] Gore pled guilty to that offense and was sentenced to probation on January 8, 1987. United States v. Gore, Case No. 85-8037. On the same day, in the same case, he pled guilty to making a false statement to a firearms dealer, in violation of 18 U.S.C. § 922(a), and was sentenced to a prison term of a year and a day. The term of probation commenced to run on Gore's release from prison.

[7] The warrant is not part of the record before the district court, which includes the record of all of the state court proceedings. At Gore's trial, no one testified to the probation condition(s) that Gore allegedly violated. On March 24, 1988, Gore appeared before a federal magistrate judge in Miami at a hearing on the probation violation charge. Gore submitted a transcript of this hearing as an exhibit to the reply brief he filed in the instant appeal. This transcript was not part of the record before the district court. The transcript indicates that the probation violation warrant was "essentially predicated on a failure to report."

7

employment, but when the deputy arrived, Gore was not there.

On March 14, 1988, a woman named Tina Corolis was assaulted, knocked unconscious, and left for dead in a wooded area in Dade County, Florida. Despite being seriously injured, Corolis survived the assault and was able to get to a phone and call for help. Her assailant absconded with her car and Corolis's toddler son, who had been in the back seat of the car, was nowhere to be found. Within twenty-four hours of the assault, Metro-Dade police had identified a prime suspect: Mars Gore.[8] Metro-Dade police joined the already on-going coordinated effort by the FBI and the Cleveland, Tennessee police to locate Gore.

---

[8] Prior to Gore's trial for Roark's murder, Detective Louis Passaro of the Sexual Battery Unit of the Metro-Dade Police Department was deposed pursuant to Fla. R. Crim. P. 3.220, which provides for, among other discovery, the taking of "discovery depositions." In his deposition testimony, he described the process of identifying Gore as the suspect in the Corolis assault. Passaro met and briefly interviewed Corolis about the assault at Jackson Memorial Hospital to which she had been air-lifted. Corolis told Passaro that she knew her assailant only as "Tony." She gave Passaro a description of Tony and told the Detective that Tony had recently been released from prison. Because Corolis told him that Tony had mentioned living in a local federal half-way house, Passaro called several such houses in the area. An employee at one of the houses informed him that the man he was looking for matched the description of a former resident – Mars Gore – and that both the FBI and the U.S. Marshals Service were also looking for Gore, the former in connection with a potential kidnapping and the latter in connection with a probation violation. Passaro obtained a picture of Gore and showed it to Corolis. She was heavily sedated, having just undergone emergency surgery, and was unable to identify her assailant from a photo array.

In the meantime, someone had returned Corolis's beeper to a service center on the morning of March 15 in return for a reward. The beeper service called Corolis to inform her that her beeper had been found. Passaro learned of this call and went to the service center on the morning on March 16. The manager picked Mars Gore's picture out of a photo array as the man who had returned Corolis's beeper. Later that day, a pawn shop owner in the Miami area also identified Gore as the man who had pawned several items of what was later determined to be Corolis's jewelry.

On March 17, 1988, a specialist in the Miami Police Department crime lab processed the black Ford Mustang GT, which was still being held in an impound lot, and identified latent prints on the driver's side window. These prints were later matched to Gore. The specialist found traces of blood in the car and a number of the items recovered from the car were later identified as belonging to Roark.

On March 17, the same day the Mustang was being processed by the crime lab specialist, L.B. McGuinty, an FBI agent assigned to the Paducah, Kentucky office, was dispatched to interview a local resident, Rex Gore. McGuinty was told that a probation violation warrant had been issued for Rex Gore's nephew, Mars Gore, and that Mars Gore was also a suspect in several federal and state criminal investigations. McGuinty, accompanied by other agents and local law enforcement, went to Rex Gore's home, where they learned from Rex Gore and his wife that Mars Gore had arrived unexpectedly in Kentucky that week and had remained in the area visiting his cousin. The agents proceeded to Gore's cousin's trailer in Ledbetter, Kentucky, where they found Gore alone, executed the warrant for his arrest for probation violation, and took him into custody.

## C.

The agents brought Gore to the FBI office in Paducah, Kentucky, where he

was read his Miranda rights and signed a waiver of rights form. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d. 694 (1966). Agents McGuinty and Larry Faust then began questioning Gore. At first, Gore spoke freely, giving general background information about himself and admitting that he was on probation in the Southern District of Florida. When the agents questioned Gore concerning how he came to be in Kentucky, though, he invoked his right to remain silent, and the agents immediately discontinued the questioning.[9] After allowing Gore to make several phone calls, the agents transported him to a detention facility in Hopkinsville, Kentucky.[10]

While Gore was being detained in Hopkinsville, two additional warrants were issued for his arrest: on March 18, a Southern District of Florida magistrate judge issued a warrant for his arrest for kidnapping Corolis's son;[11] and on March 22, the Dade County, Florida Circuit Court issued a warrant for his arrest for the

---

[9] In invoking his right to silence, Gore did not ask for a lawyer.

[10] During the trip to Hopkinsville, Gore made an unsolicited statement to the agents, telling them that they would be famous some day because books would be written about him. Prior to trial, Gore moved the court to suppress the statement. The court denied the motion, and the State introduced the statement into evidence at his trial. The Florida Supreme Court affirmed the trial court's ruling, and the district court found no merit in Gore's challenge to that decision in denying Gore's petition for writ of habeas corpus. While we granted a certificate of appealability to review statements Gore made to the Metro-Dade police, this statement to the FBI agents is not before us.

[11] Corolis's son had been found in an abandoned house in Dade County, Georgia, after neighbors noted suspicious activity around the house and alerted the authorities.

assault and attempted murder of Tina Corolis.  On March 23, the U.S. Marshals

Service and the FBI transported Gore to Miami.[12]

The record indicates that on the next day, March 24, Gore appeared before a

Southern District of Florida magistrate judge.  The court was aware that the Dade

County Circuit Court had issued a warrant for Gore's arrest for the assault on Tina

Corolis and that the Metro-Dade police were standing by to take him into custody.

The record before us does not explain the procedure the court thereafter followed.

All it tells us is (1) that the probation violation charge was "dropped," (2) that

Metro-Dade Detectives Lou Passaro and David Simmons obtained Gore's custody

and took Gore to the homicide bureau of the Metro-Dade police headquarters, and

(3) that they did so after Gore's court-appointed counsel advised Gore not to talk

---

[12] The record before the district court, and this court on appeal, contains nothing indicating that the FBI executed the March 18 kidnapping warrant while Gore was in detention in Hopkinsville.  Gore appended to his reply brief in this appeal a copy of the transcript of the hearing that was held before a federal magistrate judge in Miami on March 24 on the charge that he had violated the terms of his probation.  The transcript indicates that Gore made two appearances before a federal magistrate judge in Kentucky – presumably in Paducah – and that he was represented by counsel at these appearances.  One appearance was likely Gore's initial appearance on the charge that he had violated the conditions of his federal probation.  Because Gore made a second appearance, we can infer that the FBI executed the March 18 warrant while Gore was being detained and took Gore before a federal magistrate judge for an initial appearance on that charge.

The transcript of the March 24 hearing was not made part of the record below, and thus is not part of the record in this appeal.  We therefore do not consider it in disposing of the issue set out in the certificate of appealability.

to the police.[13]

At the Metro-Dade police headquarters, Detective Simmons advised Gore of his <u>Miranda</u> rights and offered him an opportunity to call the Dade County Public Defender's office.  Gore declined the opportunity, and Simmons then questioned him for seven hours regarding Roark's disappearance, the assault on Corolis, and the February 14 assault of a third woman, Maria Domingues.

Several hours into the interrogation, Detective Simmons learned that an attorney from the Dade County Public Defender's office was attempting to gain

---

[13] Though, again, we do not consider it in disposing of the issue set out in the certificate of appealability, the hearing transcript attached to Gore's reply brief assists us in filling in certain lacunae in the record before us.  The transcript reveals that the hearing before the magistrate judge was in response to Gore's arrests both on the warrant for probation violation and the warrant for kidnapping, and that, at Gore's request, the court declared him indigent and appointed an assistant Federal Public Defender to represent him.  As the hearing progressed, the assistant U.S. Attorney stated that the government would dismiss the kidnapping charge – likely because it formed an integral part of the State's case against Gore for the attempted murder of Corolis's son – and did not object to Gore being turned over to the Metro-Dade police.  The transcript also reveals that the assistant public defender asked the court to order the Metro-Dade police not to interrogate Gore.  Counsel stated:

> Judge . . . we would be requesting that you enter an order.  We are requesting that no state, county, city, or federal police officer be permitted to interview Mr. Gore. He is invoking his Fifth Amendment right right now as far as any agency, and we would request that you enter an order to that effect.

The court denied counsel's request.  We refer to the transcript here because, as part of Gore's reply brief, it is part of the foundation for Gore's argument that the assistant public defender's instruction that Gore not talk to the police supports his claims that the Metro-Dade police interrogated him in violation of the Fifth, Sixth, and Fourteenth Amendments.

The court's docket sheet for the probation violation charge, which we obtained from the district court clerk's office, indicates that the probation violation charge was not dropped. Instead, the court scheduled a probable cause hearing on that charge for April 4, 1988.

access to Gore. Simmons passed this information on to Gore, and again asked him if he wished to have counsel present. Gore answered in the negative, and Simmons resumed his interrogation. Gore made several statements that were introduced into evidence at his trial, during the State's case-in-chief. These statements are the focus of this appeal.

## D.

On April 2, 1988, four members of the Columbia County, Florida Sheriff's Office mounted posse were searching a wooded area near Interstate 75 for an elderly man who had been reported missing. Instead of finding the man, they found the skeletonized remains of a young woman. The woman was naked. Shoe laces were tied around her wrists, indicating that she had been bound. Dental records soon confirmed that the unidentified body was Susan Roark's.

On July 12, 1988, the Columbia County Circuit Court issued a warrant for Gore's arrest for the murder of Susan Roark.[14] On April 25, 1989, a Columbia County grand jury handed down a three-count indictment in the Roark case, charging Gore with first degree murder, kidnapping, and armed robbery. After a

---

[14] At the time, Gore was in custody in Dade County, where the State was pursuing charges stemming from the attempted murder of Tina Corolis and the abduction and attempted murder of her son.

Dade County jury found Gore guilty in the Tina Corolis case,[15] the Columbia County Sheriff's Office obtained Gore's custody, and on June 29, 1989, in the Columbia County Circuit Court, he pled not guilty to all three counts of the indictment.

## II.

The Roark case was initially set for trial in September of 1989. The parties invoked the liberal discovery procedures provided by Rule 3.220 of the Florida Rules of Criminal Procedure, and most of the witnesses who would be called to testify by both the State in its case-in-chief and by Gore were deposed. To accommodate Gore's need to depose the State's voluminous list of potential witnesses, the court continued the trial on several occasions. After all discovery was completed, the trial was set for March 5, 1990. Prior to trial, the State, anticipating Gore's objections, informed Gore that, among other things, it planned to introduce the statements Gore gave to Detective Simmons at the Metro-Dade police headquarters.[16] The State also provided Gore with written notice that it

---

[15] Gore was convicted of the charges involving Tina Corolis: attempted murder, kidnapping, sexual battery, burglary, robbery, and theft. He was also convicted of the attempted murder of Corolis's son, but this conviction was reversed on appeal. See Gore v. State, 573 So. 2d 87 (Fla. 3d Dist. Ct. App. 1991).

[16] The State also informed Gore that it intended to introduce statements Gore made to Columbia County Detective Neal Nydam while he was detained in Columbia County awaiting trial. The State eventually sought to introduce the statements made by Gore to the FBI agents in

14

intended to introduce evidence that Gore had assaulted several women in the Dade County vicinity during February and March of 1988, namely Brandi Rush, Maria Domingues, and Tina Corolis.[17]  Evidence of these assaults, the State theorized, was relevant to establish the identity of Roark's assailant and Gore's intent.

Prior to the trial, Gore moved to exclude the evidence of the purported assaults, arguing that it was inadmissible under Williams v. State, 110 So. 2d 654 (Fla. 1959), because it served no purpose other than to prove that he was a person of bad character with the propensity to commit the crimes alleged in the indictment.[18]  Gore also moved the court in limine to suppress the statements he gave the law enforcement officers on the ground that they were taken in violation

Kentucky following his arrest on the probation violation warrant.

[17] The State was obligated to provide Gore – no fewer than ten days before the trial date – with "a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information."  Fla. Stat. § 90.404(2)(c).  The written notice listed the women assaulted by Gore as B.R., M.D., and T.C. respectively.  By the time of the hearing on Gore's motion to exclude this evidence, the State had apparently abandoned its intention to introduce evidence regarding the assault of Brandi Rush, and instead had provided Gore's counsel with oral notice that it intended to introduce evidence of the assault of a fourth woman, Lisa Ingram.

[18] The assaults at issue were the February 6 assault of Brandi Rush; the February 14 sexual assault of Maria Domingues, which Domnigues alleged occurred in a black Mustang automobile; the February 20 sexual assault of Lisa Ingram; and the March 14 assault of Tina Corolis.  As indicated in the text infra, at trial, the court overruled Gore's objection to this evidence.  As the trial progressed, the prosecutor apparently had second thoughts about presenting some of the assaults and limited its proof to the Corolis assault.  Lisa Ingram did testify, but not about her sexual assault.  Her testimony was brief – about a statement Gore made to her prior to the assault.

15

of his rights under the Fifth, Sixth, and Fourteenth Amendments.[19]

The court deferred ruling on the admissibility of the State's proffers, stating that it would consider the matter at trial, during the State's case-in-chief. It cautioned the State not to refer to the proffered evidence in any way – whether in opening statement to the jury or through the examination of its witnesses.

The court held a hearing on Gore's objections and motion to suppress on the sixth day of the trial, while the jury was in recess. Because the statements Gore made to Detective Simmons of the Metro-Dade Police Department[20] form the basis of the constitutional issues we address in this appeal, we begin with that hearing. We then turn to the evidence presented to the jury, both before and after the court disposed of Gore's challenges.

A.

Gore's in limine motion to suppress alleged that Detective Simmons

---

[19] Gore moved to suppress the statements he made to both Detectives Simmons and Nydam. The motion also sought to suppress any statements obtained by any law enforcement officials in violation of Gore's rights. Thus, the motion encompassed Gore's statement to the FBI in Kentucky, which the State also sought to introduce.

[20] A second Metro-Dade police officer was present during Detective Simmons's interrogation of Gore. The certificate of appealability refers to the questioning conducted by the Metro-Dade "detectives," not the questioning conducted by any individual officer. For the sake of clarity, we discuss the Metro-Dade interrogation with specific reference to Detective Simmons, who conducted the only interrogation relevant to the present appeal.

16

obtained five statements[21] in violation of Gore's rights under the Fifth, Sixth, and Fourteenth Amendments: (1) Gore claimed he could not recall having ever driven a 1986 black Ford Mustang with a Tennessee license plate; (2) Gore denied having ever met Susan Roark; (3) Gore denied having ever met Tina Corolis; (4) Gore denied that he had ever driven a 1987 red Toyota Corolla; and (5) Gore denied having ever been to a pawn shop where some of Tina Corolis's jewelry was pawned the day after she was assaulted.[22]

1.

At the suppression hearing, FBI agents McGuinty and Faust testified that they were aware when they arrested Gore for violating his probation that he was a suspect in ongoing state investigations. They testified that Gore was read his Miranda rights and signed a waiver of rights form, following which he spoke freely, for a time, until the questioning turned to how he arrived in Kentucky. At that point, Gore invoked his right to remain silent. The agents ceased questioning

---

[21] The five statements set out in the accompanying text appear at first blush to be exculpatory. When considered in the light of the evidence the State presented to the jury, however, the statements were inculpatory.

[22] As noted supra, Gore's motion to suppress included the statements he made to FBI Agents McGuinty and Faust and to Detective Neal Nydam of the Columbia County Sheriff's Office. The court denied Gore's challenge to the statements made to the agents, and the Florida Supreme Court affirmed. The supreme court's ruling is not before us in this appeal. The trial court granted Gore's motion to suppress the statements to Detective Nydam, after the State conceded that they were inadmissible.

17

Gore, allowed him to make several phone calls to his father, and then transported him to a federal detention center. Both agents said that Gore did not request a lawyer.

Detective Simmons testified that, following Gore's appearance before the federal magistrate judge in Miami on March 24, 1988, the Metro-Dade police arrested Gore for the assault on Tina Corolis and took him into custody.[23] Gore was then transported to Metro-Dade police headquarters, where he was read his rights. He refused to sign an advice-of-rights form. Prior to questioning Gore, Simmons was aware that the magistrate judge had appointed an attorney to represent Gore regarding the probation violation charge; that the attorney had advised Gore not to answer any questions; and that Gore had invoked his right to remain silent when questioned by the FBI in Kentucky. Simmons said that Gore indicated that, despite the attorney's advice, he was willing to talk, because he had nothing to hide. Simmons then offered Gore the opportunity to speak to someone in the Dade County Public Defender's office. Gore declined the offer.

Simmons interrogated Gore for approximately seven hours, eliciting, among others, the five statements we have listed. Simmons said that around nine that

---

[23] As noted supra, the Dade County Circuit Court had issued a warrant two days earlier for Gore's arrest for crimes committed during the Corolis assault.

evening – six hours into the interrogation and after Gore had made the statements – Simmons was made aware that an attorney with the Dade County Public Defender's office had been asking to speak to Gore. Simmons again offered Gore an opportunity to speak to a lawyer, and again Gore declined.

2.

In support of the motion to suppress, Gore's counsel called Judy Alves, the assistant public defender who had asked to speak to Gore. Alves was a member of the Public Defender's major crimes division. She testified that after learning of Gore's arrest on March 24, from several news outlets, she went to the Dade County jail and asked to be admitted to see Gore. She was informed that he was not at the jail.

Alves then went before a Dade County circuit judge and obtained an order directing the Dade County jail to allow her access to Gore.[24] Alves returned to the jail and was again told that Gore was not there. She then proceeded to the Metro-Dade police headquarters and advised a person on duty in the Homicide Division

---

[24] We note that, while the order Alves obtained serves as the fulcrum for a great deal of Gore's argument that a writ of habeas corpus should issue – and while the order must have been reduced to writing if it was to be in any way efficacious for Alves when she appeared at the jail – the order was not made a part of the record of the suppression hearing and, thus, is not part of the record now before us. All we have is the testimony of Alves regarding the order and a partial transcript of the subsequent hearing before the circuit judge, during which Alves sought enforcement of the order. Gore introduced this partial transcript into evidence at the hearing on his motion to suppress the statements made to Detective Simmons.

that she had a court order allowing her to see Gore. She was told that Gore was in the building, but she was denied access.

After this, Alves returned to the Dade County circuit judge who had issued the order seeking enforcement of the order. The judge convened a hearing on the matter. An Assistant State Attorney (from the Dade County State Attorney's office) appeared and informed the judge that Gore had not yet been taken to Dade County jail.[25] Accepting the attorney's representation, the judge told Alves that she could see Gore once he was taken to the jail. Alves, instead, returned to Metro-Dade police headquarters and demanded to see Gore. She met with no success.

In addition to calling Alves in support of his motion to suppress, Gore also called Detective Lou Passaro, the lead investigator in the Tina Corolis case. Passaro testified that, prior to Gore being transferred to state custody on March 24, the FBI informed him that Gore had aborted the agents' interrogation in Kentucky by refusing to answer further questions.

Finally, Gore himself testified. Gore said that he never waived his rights

---

[25] The partial transcript of the hearing reveals that the Assistant State Attorney also represented that while Gore had been taken into state custody, he had not yet been taken to either the Dade County Jail or the Metro-Dade police headquarters. This statement cannot be squared with the testimony of all the witnesses who testified as to the time line of Gore's custody on that day. All the witnesses agreed that at the time Alves first sought access to Gore at the Metro-Dade police headquarters, Gore was in the building being interrogated.

while being interrogated by Detective Simmons. His response to every question Simmons posed was "I want an attorney, I want a phone, and I want to go to the bathroom." He did not dispute that, despite this refusal to answer questions, the session lasted in excess of seven hours.[26]

At the conclusion of the hearing, the court denied Gore's motion to suppress the statements made to Simmons.

## B.

As previously noted, Gore's trial began on March 5, 1990. The State opened its case-in-chief with testimony about the discovery of Roark's body and the investigation by the Columbia County Sheriff's Office and the Florida Department of Law Enforcement ("FDLE") into Roark's identity and likely cause of death. The State then presented evidence of Roark's disappearance, Gore's flight from Tennessee to Tampa and on to Miami, the assault on Corolis and the flight from Miami to Kentucky, and, finally, the arrest and law enforcement interrogation.

## 1.

---

[26] On cross-examination, Gore insisted that the questioning lasted even longer – until one in the morning. Earlier during the suppression hearing, Detective Simmons had testified that the session ended around eleven at night and that, at Gore's request, the police had waited until after the evening news ended to transport him to the jail – thereby denying the reporters waiting outside the jail an opportunity to film Gore.

Members of the Columbia County Sheriff's Office mounted posse, who had discovered Roark's body, testified that they found the body while searching a wooded area not far from Interstate 75 for signs of a missing Columbia County man, Leroy Mills. After finding Roark's largely decomposed naked body, just off an access road next to a trash heap, the posse contacted the Sheriff's Department.

Sergeant Randal Roberts, who responded to the initial call from the mounted posse, and Detective Neal Nydam, the chief investigator, described the scene where the body was found. A shoelace tied around Roark's left wrist led them to conclude that Roark had been bound and to classify the case as a probable homicide. Several strands of hair were found in Roark's hand. Beer bottles and an empty cigarette pack were found near the body as were a torn t-shirt, a pair of women's underwear and a ripped panty shield. When the body was moved a pair of earrings were found underneath. A search for fingerprints failed to come up with even a single usable latent print.

Following the identification by medical experts of the likely gender and approximate age of the deceased, Detective Nydam sent out a national teletype with a description of the victim. The Cleveland Police Department saw the teletype, contacted Nydam, and sent him a copy of Susan Roark's dental records. Roark's dentist, Vernon Bryant, testified that the dental records confirmed that the

body found in Columbia County was Susan Roark's.

Next, the State presented testimony and evidence concerning the examination of the body by the State's medical experts. FDLE serologist Sue Livingston testified that while the body's tissue had so deteriorated that blood analysis was impossible, there were indications that there was blood on the shoulders of the shirt found near the body.

Forensic anthropologist William Maples testified that the extreme decomposition of the left breast indicated that there may have been an injury to that area, making it the easiest target for insects and other catalysts of decomposition. Also a small nick in the bone at the base of the skull was most likely the result of a knife wound to that area. Maples estimated that, given the level of decomposition, the body could have been in the Columbia County woods anywhere from two weeks to six months before it was discovered, but that a two to four month range was the most likely scenario.

Deputy Chief Medical Examiner Bonifacio Floro testified that the string found on the wrist had been tied sufficiently tightly prior to death to leave a mark. Floro opined that the likely cause of death was homicidal violence.[27] Floro stated

_____

[27] Floro's opinion was based in part on Roark's medical record, which showed no history of acute or chronic illness, and on the absence of evidence of a substance abuse problem. In light of these factors, Floro concluded that death by natural causes – such as a heart attack or an

that the decomposition of the neck was consistent with strangulation or a neck injury, and that this was the likely cause of death. Floro opined that Roark was probably placed where she was found within a half an hour of her death and that she likely died around two months before her body was discovered.

All the State's medical experts conceded that there was no physical evidence linking Gore to Roark's death. Indeed, it was impossible to conclude definitively that Roark did not die from some cause other than homicide.

After presenting the testimony of these expert witnesses, the State proffered a chronology of Roark's final day, followed by an accounting of Gore's activities during his flight from Tennessee, and ending with his apprehension by the FBI in Kentucky. Nathan Caywood and Jimmy Doyle Stafford testified that they had met Gore at the Cleveland Mall in the weeks leading up to Roark's disappearance. Gore had prevailed upon Caywood to drive with him to Panama City, Florida, for what Gore described as a lucrative business deal. After initially resisting Gore's entreaties, Caywood had agreed to accompany Gore. The pair made plans to meet at the Rocky Top Market on the evening of January 30, 1988. Gore did not know

---

aneurysm – was extremely unlikely. Floro cited the facts that Roark's wrists were bound and that the body had been found naked in the woods in opining that other explanations for the death, such as suicide or accident, were unlikely. Having thus excluded all other potential causes of death, Floro said that homicide was the most likely cause.

where the market was, so Caywood had Stafford take him there. While Gore and Stafford were waiting for Caywood, Gore struck up a conversation with a young female customer, whom Stafford recognized as Susan Roark.[28] Soon thereafter, the Gore and Roark drove off in Roark's black Ford Mustang GT. Caywood testified that when he arrived at the market to meet Gore, Gore was not there. Caywood did not hear from Gore again, and they never took their planned trip to Florida.

Michelle Trammell testified that she was hosting a small party that night at her trailer just outside of Cleveland. She and several other party attendees testified that Roark arrived at the party some time between nine and ten o'clock with a man she introduced as "Tony," but whom they all were able to identify at trial as the defendant, Mars Gore. Gore shot darts and drank beer with the men, while Roark and Trammell went out for a bit. About two hours after arriving at the party, Roark told Trammell that she was going to drive Gore to a particular address in Cleveland and then return to Trammell's trailer, where she planned to spend the night. Gore and Roark left the party together around midnight.

The State called Roark's grandmother, Ruth Roark, who testified regarding

---

[28] Another witness, Paul Eumiker, testified to having seen Susan Roark at the market that evening.

her grand-daughter's failure to come home at the promised time on January 31st, and the family's initial attempts to locate her through calling her friends. When they were unable to locate Roark they reported her disappearance to the police. Detective Dewey Chastain then testified as to the initial efforts of the Cleveland police to locate Roark.

Gore's former girlfriend Susan Brown testified that the next day, January 31, 1988, Gore appeared unexpectedly at the Domino's Pizza franchise in Tampa, Florida, where she worked. Gore arrived alone, driving a black Ford Mustang. Gore told Brown that he had driven all night from Tennessee to Tampa[29] and that the Mustang was a gift from his mother. Brown informed Gore that he would have to get a hotel room because he could not stay with her.[30] In response, Gore asked Brown for help pawning some jewelry so he could pay for the room.[31] Over the course of two days, they visited numerous pawn shops in Tampa and pawned

---

[29] Later in the trial, the State established that Interstate 75, the major highway near which Roark's body was found, was the most direct route from Cleveland, Tennessee to Tampa, Florida. The highway proceeds on to Miami, and the State established that Interstate 75 was the route taken by Gore when he eventually left Tampa for Miami.

[30] Brown testified that she had attended high school in Miami with Gore and she now was a student at the University of Tampa. About a month earlier, Gore had stayed with her in her dorm room on his way from Miami to Cleveland, Tennessee, to visit his mother.

[31] Gore told Brown that he had lost his license, and that because identification is required to pawn an item, he would need someone to go with him. Brown agreed to do so.

several items of jewelry.[32]  Much of this jewelry was identified at trial to be

Roark's.[33]  When Brown inquired how Gore came to be in the possession of the

jewelry, he responded that it belonged to a girlfriend of his.  On February 1, Gore

failed to keep an appointment to meet Brown at a diner, and she did not see him

again.[34]

Rosa Lastinger was a friend of Brown's whom Brown had introduced to

Gore while Brown was home in Miami for the 1987-1988 Christmas-New Years

holiday season.  Lastinger testified that, on February 4, 1988,[35] she received a call

---

[32] The State followed Brown's testimony by presenting the testimony of a succession of pawn shop employees verifying that Gore and Brown had sold them the jewelry, and the testimony of FBI Agent James Barrow, who later seized the jewelry.  Brown also testified that one of the rings Gore attempted to pawn bore Roark's initials and that the pawn shop refused to accept the ring, a class ring, because the initials engraved in the ring did not match Brown's initials.

[33] Trammell was able to identify several of the items of jewelry, as was Carolyn Roark, Susan's step-mother.

[34] Later in the trial, the State corroborated Brown's testimony that Gore was in Tampa on February 1 by presenting Gore's mother, Brenda Gore, to establish the authenticity of her phone bill.  The bill showed that she had received a collect call from a Tampa pay phone on February 1. The State also called Tampa Sheriff's deputy John Blanchard who testified that he had located the payphone with the numbers found on Brenda Gore's bill.  The phone was in a lounge located across the street from the Domino's Pizza where Susan Brown worked.

[35] The State's only evidence to account for Gore's whereabouts from February 1, when Brown last saw Gore, to February 4, when he moved in with Lastinger, was the testimony of Sergeant John D. Ross of the Florida Highway Patrol.  Ross testified that at 10:32 a.m. on February 2, he stopped a black Ford Mustang GT that was southbound on Interstate 75, just outside of Punta Gorda.  He stopped the car for speeding, and issued a traffic citation to the driver, whose license identified him as Marshall Gore.  The Cleveland police had not yet entered information about Roark's car into the NCIC database at the time of the stop.  Later, the car was determined to be Roark's.

27

from her employer, a car dealership in Miami, informing her that a man named Tony was at the dealership asking to see her. When the man was put on the phone, Lastinger recognized "Tony" as Brown's friend Mars Gore. Gore told Lastinger he wanted to trade in a car, and Lastinger made an appointment to meet him at the dealership. After they met there, Gore began filling in the paperwork for trading in a black Ford Mustang GT, but he was unable to complete the transaction because he did not have the car's title and registration. He explained to Lastinger that this paperwork was at his father's house, and that he was unable to retrieve it because he and his father were on the outs. When Gore informed Lastinger that he did not have a place to stay in Miami, Lastinger invited Gore to stay at her home, and Gore accepted.[36]

In the early morning hours of February 14, 1988, Gore called Lastinger and told her that he had been in an accident while driving the black Ford Mustang GT. He asked her to pick him up. When she did so, Gore was on foot and the Mustang was nowhere to be seen.

Manuel Garcia-Lineres, a Miami physician, testified that he was in an

---

[36] The jury learned that at the time Gore moved into Lastinger's home, others, in addition to Lastinger, occupied the residence. Among them were Marisol Coto and Coto's 13-year old daughter, Jessie Cassanova.

accident with a black Ford Mustang GT early in the morning of February 14, and that the driver of the other car apparently fled the scene of the accident on foot. The State followed Garcia-Lineres's testimony with that of the Miami police officer who came to the scene, the independent contractor who towed the abandoned Mustang to an impound lot, the detective who investigated case, and several crime lab technicians who examined the car and the items found within it. This testimony established that a speeding ticket bearing Gore's name and several items later identified as belonging to Susan Roark were inside the car.[37] A latent print on the inside driver's side window matched Gore's and several items in the car tested positive for blood.[38]

Lastinger testified that she received a call from Susan Brown on March 13. Brown told her that an FBI agent had contacted her about Gore and that she

---

[37] See note 3, supra. Gore, driving the black Mustang, had been pulled over and cited for speeding on February 11. Lastinger was with him in the car. Officer Mildred Padrone of the Miami Police Department, who initially pursued a speeding Gore, testified for the State. The day before Gore received the citation, the Cleveland police had re-entered the Mustang's tag number into the NCIC database in connection with a missing person's file. The tag number was entered incorrectly, so running the Mustang's tag number through the NCIC database as part of the traffic stop would have turned up nothing. The entry error was not discovered until after the car had been impounded and the Miami Police Department identified the owner.

[38] The State introduced other evidence linking Gore to Roark's Mustang. During the six weeks Gore lived with Rosa Lastinger, he had given Jessie Cassanova several gifts. Many of these gifts were used by the State to link Gore to the murder of Roark. Through the testimony of Jessie Cassanova and FBI Agents Carl Lowery and Weldon Keating, the State established that a key given by Gore to Cassanova as a gift was the key to Roark's Mustang. Gore had also taken a box of cassette tapes from the car and given the tapes to Cassanova as a gift.

informed the agent that Gore was living with Lastinger in Miami.[39] Lastinger

passed this information on to Gore and asked him to move out of her house. He

did so.[40]

Tina Corolis testified that Gore – an acquaintance with whom she had

previously gone on one date – telephoned her on March 14, 1988. Gore told her

that his car had broken down, and he asked Corolis for a ride to another car.

Corolis arrived in her brand-new red Toyota Corolla. Her toddler son was in a car

seat in the back. Gore and Corolis spent the next several hours driving around

Miami looking for Gore's replacement car. At one point during the search, Gore

asked Corolis to pull over so that he could relieve himself. When he returned to

---

[39] It is not clear from the testimony of Brown and Lastinger how Brown came to know that Gore had returned to Miami and moved in with Lastinger.

[40] Very little evidence was presented to the jury to account for Gore's whereabouts and activities during the period between February 4, when Gore moved in with Lastinger, and March 13, when he moved out. The testimony presented at the suppression hearing indicated that on February 14 – the day Gore and Garcia-Lineres were involved in an auto accident and he abandoned the Mustang – Gore allegedly sexually assaulted and slashed the throat of Maria Domingues, and that on February 20, he allegedly assaulted Lisa Ingram. Ingram described this assault during her testimony at the suppression hearing, but in testifying before the jury, she was not asked about the incident. Ingram's testimony before the jury was brief; accordingly, we do not recount it in the text. On March 12, the day before Lastinger asked Gore to move out of her house, he murdered Robyn Novick. Her body was found near Lastinger's home four days later, on March 16. Several years after the Roark trial ended, Gore was convicted and sentenced to death for the murder and armed robbery of Robyn Novick. Gore v. State, 784 So. 2d 418 (Fla. 2001) (affirming convictions and death sentence on retrial after an initial conviction had been reversed and remanded by Gore v. State, 719 So. 2d 1197 (Fla. 1998)). The State made no attempt to use the Novick assault for the purpose of establishing the identity of Roark's assailant; hence, the jury did not learn of her assault and murder. On March 14, the day after he left the Lastinger residence, Gore assaulted Tina Corolis.

30

the car, he brandished a knife and ordered Corolis to move over to the passenger seat. Gore then got behind the wheel, and drove to a wooded area where he raped her, strangled her, and punched her face. She lost consciousness, and Gore left her for dead. When she regained consciousness, Gore was gone, as was her car and her son.[41]

The State established that soon after assaulting Corolis, Gore stopped at a pawn shop in Miami where he pawned some of her jewelry. Gore's fingerprint was found on the pawn shop receipt. The person Gore dealt with identified Gore.

The State called Rex Gore, Gore's uncle, and Rex Gore's wife, Ashley, to testify. They stated that Gore had arrived unexpectedly at their home in Ledbetter, Kentucky, on March 15, 1988. Gore was driving a red Toyota Corolla.

Finally, the State called FBI agents L.B. McGuinty and Larry Faust, and Detective Simmons of the Metro-Dade Police Department. Through these witnesses, the State went over the details of Gore's apprehension by the FBI on March 17 in Ledbetter, his interrogation by the FBI that day in Paducah, his transfer to the custody of the Metro-Dade police on March 24 in Miami, and his interrogation by Detective Simmons. This testimony tracked closely the testimony

---

[41] Gore insisted, against the advice of counsel, on personally conducting the cross-examination of Tina Corolis. He focused on Corolis's credibility, implying that, as an exotic dancer, she was skilled at the art of deception.

31

given by these witnesses during the suppression hearing which we have summarized. For the sake of concision, we do not repeat it at length here. Of particular importance to the issue presented in this appeal, McGuinty, Faust, and Simmons established that: the FBI advised Gore of his Miranda rights prior to interrogating him on March 17; Gore cut off the questioning by invoking his right to remain silent; Gore did not request to see a lawyer; on March 24, after the federal magistrate judge appointed an attorney to defend him against the charge that he had violated the conditions of his probation and the attorney advised him not to speak to the police without counsel present, Gore was transferred to the custody of the Metro-Dade police; Gore was, again, advised of his rights by Detective Simmons and given an opportunity to call a lawyer; Gore refused the lawyer and indicated he was willing to speak with Simmons; and during the subsequent questioning, Gore made statements the admission of which are the heart of this appeal.

Following the presentation of the testimony of these law enforcement officials, the State rested. Gore moved for a judgment of acquittal on all three counts of the indictment. The court denied his motion.

2.

In his defense, Gore called several of the police officers who had

32

investigated Roark's disappearance and the area where Roark's body was discovered. Through these witness, defense counsel highlighted the paucity – or, indeed, the total absence – of physical evidence linking Gore to Roark's murder. Additionally, counsel implied that Roark had been killed by someone else by calling Linda Hensey from the FDLE crime lab. Hensey testified that the hair found in Roark's hand was not Gore's and that she was never asked to test that hair against the hair of any other suspect.

Gore introduced into evidence the pre-trial depositions of two potential alibi witnesses, who were unavailable to testify: Michelle Gore and Stephanie Refner.[42] Michelle Gore, Gore's sister, testified that Gore had disappeared from Miami just before Christmas 1987, and that he had returned to Miami driving a black Ford Mustang with out-of-state plates some weeks later. She believed that she first saw him driving the car prior to the date of Roark's disappearance. She also said that some of her jewelry, roughly matching the description of the jewelry Gore had pawned, was missing.

Stephanie Refner, a resident of Cleveland, Tennessee, testified that, after seeing a story about Roark's disappearance in the local newspaper, she called

---

[42] Gore was unable to locate Michelle Gore. Stephanie Refner was unable to travel to court for medical reasons.

Dewey Chastain of the Cleveland Police Department.  She told Chastain that she

had seen Susan Roark driving in Cleveland after the date of Roark's

disappearance.[43]  After introducing these depositions, the defense rested.

In rebuttal, the State called two witnesses to counteract Refner's testimony:

Cleveland resident Randal Giles and Susan Roark's father, Harold Roark.  They

testified regarding the extent of the search for Roark following her disappearance

and to the number of times they themselves had seen black Mustangs in the

Cleveland area and mistakenly believed that the cars might be Susan's.

3.

After the State presented its rebuttal evidence, Gore once again moved for a

judgment of acquittal and was again denied.  Following closing arguments, the

case was submitted to the jury.  On March 14, 1990, the jury returned a guilty

verdict on all three counts of the indictment.  Because Gore was convicted of a

capital offense,[44] the trial as to that offense proceeded to a penalty phase.[45]  The

---

[43] Gore also called Chastain as a witness.  He corroborated Refner's deposition testimony.

[44] Under Fla. Stat. § 782.04, premeditated murder is a capital offense.

[45] Fla. Stat. § 782.04 provides that the processes of Fla. Stat. § 921.141 shall apply when the State seeks the ultimate penalty.  Under Fla. Stat. § 921.141, after a conviction for a capital offense, the case proceeds to the penalty phase at which evidence of aggravating and mitigating factors is presented and the jury, after balancing these factors, decides whether to recommend the death sentence.  The State presented evidence of four of the aggravating factors enumerated in § 921.141: that Gore had a prior conviction for a violent offense, that the murder took place during a kidnapping, that the crime was committed for financial gain, and that the murder was cold,

jury voted to impose the death penalty by a vote of eleven to one. On April 3, the

court accepted the jury's recommendation, and imposed a sentence of death by

electrocution.[46]

C.

Gore appealed his convictions and death sentence to the Florida Supreme

Court. He asserted numerous grounds for reversal, including the circuit court's

failure to suppress the statements made to Detective Simmons. On April 16, 1992,

the court affirmed Gore's convictions and death sentence,[47] holding, among other

things, that the admission of Gore's statements to Detective Simmons did not

violate Gore's constitutional rights. Gore v. State, 599 So. 2d 978 (Fla. 1992). On

November 30, 1992, the United States Supreme Court brought an end to Gore's

direct appeal when it denied his petition for certiorari. Gore v. Florida, 506 U.S.

1003, 113 S. Ct. 610, 121 L. Ed. 2d 545 (1992).

---

calculated, and premeditated. In mitigation, through the testimony of his mother, Gore presented evidence of a troubled childhood.

[46] The trial court found that the State had proven four statutory aggravating factors beyond a reasonable doubt and that these factors outweighed Gore's mitigation evidence. Gore was sentenced to prison for life for the kidnapping conviction and for 15 years for the armed robbery conviction.

[47] The Florida Supreme Court did, however, reverse one of the jury's penalty phase findings regarding aggravating factors. The court held that the evidence did not support a finding that the murder had been committed in a cold, calculated, and premeditated manner. The court held that this error was harmless.

35

Gore then turned to the Columbia County Circuit Court, moving that court on May 2, 1994 to vacate his convictions and sentences pursuant to Florida Rule of Criminal Procedure 3.850. Gore subsequently amended his Rule 3.850 motion and filed additional independent Rule 3.850 motions. The circuit court eventually denied all of Gore's motions. On April 17, 2003, the Florida Supreme Court affirmed. Gore v. State, 846 So. 2d 461 (Fla. 2003).[48]

His state court remedies exhausted, on September 3, 2003, Gore filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle District of Florida. He amended the petition on April 22, 2005. The amended petition asserted twelve grounds for relief, among which was a claim that the trial court's failure to suppress the statements Gore made to Detective Simmons violated his right to counsel under the Fifth, Sixth, and Fourteenth Amendments.

On January 31, 2006, the district court denied Gore's request for an evidentiary hearing and his petition for writ of habeas corpus. Gore moved this court for a certificate of appealability on March 28,[49] and on April 27, we granted

[48] In affirming the circuit court's decision, the supreme court also denied Gore's petition for a writ of habeas corpus, which presented eight claims in addition to those alleged in his Rule 3.850 motion.

[49] Gore had applied to the district court for a certificate of appealability on March 1, 2006. The court denied his application.

36

his motion with respect to the single issue before us now – the Florida Supreme Court's decision that the admission at trial of Gore's statements to Metro-Dade Detective Simmons did not violate Gore's rights under the Fifth, Sixth, and Fourteenth Amendments. We turn to that issue now.

## III.

Gore filed his petition under 28 U.S.C. § 2254, which authorizes this court to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Our review, however, is not plenary; where, as here, there is a determination by the state court on the merits of the claim, our review is constrained by § 2254(d), which provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This more deferential standard of review of state court judgments was put in place by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1218 (1996); see Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001).

Gore argues that the Florida Supreme Court's rejection of his claim that the statements he gave Detective Simmons should have been suppressed was erroneous both in its legal conclusions and its factual determinations. AEDPA sets forth separate standards of review depending on whether we are reviewing a conclusion of law or a determination of fact. We discuss each standard in turn.

A.

In reviewing a state court's conclusions of law, we look to 28 U.S.C. § 2254(d)(1), which makes clear that we may only issue a writ of habeas corpus when a state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" § 2254(d)(1).

The two conditions set forth in § 2254(d)(1) – the "contrary to" and "unreasonable application" clauses – present "independent statutory modes of analysis." Alderman v. Terry, 468 F.3d 775, 791 (11th Cir. 2006) (citing Williams v. Taylor, 529 U.S. 362, 405–07, 120 S. Ct. 1495, 1519–20, 146 L. Ed. 2d 389

38

(2000) (O'Connor J., for the majority)). A state court decision is "contrary to" established federal law if it "applies a rule that contradicts the governing law set forth [by the Supreme Court]." Williams, 529 U.S. at 405, 120 S. Ct. at 1519 (O'Connor, J., for the majority). In other words, a state court's decision is "contrary to" federal law – an issuance of a writ of habeas is appropriate – if the decision applies a legal principle "substantially different from the relevant precedent of [the Supreme Court]."[50] Id.

Where the state court correctly identifies the governing precedent, that court's decision cannot be said to be "contrary to" federal law. Id. at 406, 120 S. Ct. at 1520 ("[A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."). That said, identifying the correct legal standard does not wholly insulate a decision from habeas review. In such cases, we apply § 2254(d)(1)'s second clause and the inquiry becomes "whether the state court's application of clearly established law was objectively unreasonable." Id. at 409. A decision may be "objectively unreasonable" if it

---

[50] The Williams Court noted two examples of decisions that would satisfy the "contrary to" standard: where the state court applies a rule that contradicts the governing law and where the state court is confronted by a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. Id. at 405–06, 120 S. Ct. at 1519–20.

"unreasonably extends or unreasonably fails to extend a clearly established legal principle to a new context." Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1098 (11th Cir. 2007) (citing Williams, 529 U.S. at 407, 120 S. Ct. at 1520 (O'Connor, J., for the majority)).

The "established federal law" which we look to in conducting both the "contrary to" and "unreasonable application" analysis is not embodied in the decisions of the lower federal courts. Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1308 (11th Cir. 2005). Section 2254(d)(1) explicitly establishes Supreme Court precedent as the vel non of "clearly established federal law." § 2254(d)(1). Our basis for comparison, therefore, is the holdings – not the dicta – of Supreme Court decisions at the time the Florida Supreme Court issued its opinion. See Williams, 529 U.S. at 412, 120 S. Ct. at 1523 (O'Connor, J., for the majority).

B.

We review a state court's factual determination under the standard of 28 U.S.C. § 2254(d)(2). As such, we may not issue the writ unless the Florida Supreme Court's decision was based on "an unreasonable determination of the facts in light of the evidence [with which the court was] presented[.]" 28 U.S.C. § 2254(d)(2). In addition to § 2254(d)(2), 28 U.S.C. § 2254(e)(1) provides:

40

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).[51]

Though AEDPA sets a high bar before a habeas petitioner who challenges a state court's factual determinations, it is not unheard of for a petitioner to successfully hurdle it. See Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005) ("The standard is demanding but not insatiable; . . . '[d]eference does not by definition preclude relief.'" (quoting Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003)); Wiggins v. Smith, 539 U.S. 510, 527–28, 123 S. Ct. 2527, 2538–39, 156 L. Ed. 2d 471 (2003) (holding a state court's factual determinations unreasonable).

IV.

We now turn to the merits of Gore's claim. In a pre-trial motion in limine, Gore sought to suppress five statements he made to Detective Simmons of the Metro-Dade police. Gore contended that the admission of these statements would

---

[51] No court has fully explored the interaction of § 2254(d)(2)'s "unreasonableness" standard and § 2254(e)(1)'s "clear and convincing evidence" standard. Since Gore fails to satisfy even the less stringent of these two standards, we need not address how they interact. See Alderman v. Terry, 468 F.3d 775, 791 n.24 (11th Cir. 2006).

violate his rights under the Fifth, Sixth, and Fourteenth Amendments. Following

an evidentiary hearing, the trial court denied his motion.[52]

In his direct appeal to the Florida Supreme Court, Gore dropped his Sixth

Amendment claim, arguing only that the admission of the statements to Simmons

violated his rights under the Fifth Amendment.[53] Gore contended that the

admission of these statements violated two distinct Fifth Amendment rights: his

right to remain silent, and his right to counsel.[54] Gore argued that the statements

were taken in violation of his right to remain silent because Detective Simmons

failed to honor Gore's invocation of this right during his March 17 interrogation

by the FBI in Kentucky. Gore maintained that the statements were taken in

violation of his right to counsel, because, though he never specifically invoked his

right to interact with police only through counsel, the appointment of a federal

---

[52] In denying Gore's motion, the court made no explicit findings of fact. It is obvious to us, however, that the court, in rejecting Gore's version of the events and accepting what Simmons had to say, implicitly found that Gore's testimony was not credible and that Simmons credibly related the circumstances surrounding Gore's interrogation.

[53] Gore has never presented a distinct Fourteenth Amendment claim for relief. He invoked the Fourteenth Amendment as a basis for his claims simply because it is through the Fourteenth Amendment that the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel apply to criminal defendants in state court. Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932).

[54] Both of these rights are concomitants to the Fifth Amendment privilege against compelled self-incrimination. We discuss the provenance of these rights in greater detail infra.

public defender as his attorney at the March 24 hearing on his federal probation violation warrant was a constructive invocation of his right to counsel for all proceedings.

The Florida Supreme Court found Gore's arguments unavailing. First, the court held that although Gore had invoked his right to remain silent during his FBI interview, that invocation did not prevent all further questioning, and that the questioning by Detective Simmons was permissible.[55] Gore v. State, 599 So. 2d at 981–82. Next, the court rejected Gore's Fifth Amendment right to counsel argument, holding that there was no evidence in the record to support an argument that he had ever invoked this right and that the appointment of an attorney on one charge – the probation violation – did not amount to the invocation of the right to counsel on other charges. Id. at 982. Finally, despite Gore's apparent abandonment of any Sixth Amendment claim to relief, the court addressed a potential right to counsel claim under that Amendment, holding that, because the Sixth Amendment right to counsel is offense-specific, the appointment of counsel for Gore's federal charges did not preclude questioning conducted in the absence

_____

[55] We endeavor here only to summarize briefly the Florida Supreme Court's holdings. As we consider each of Gore's arguments, we will discuss the relevant Florida Supreme Court holdings in greater detail.

43

of counsel on unrelated state charges.[56]  Id.

In his petition for writ of habeas corpus, Gore challenges the factual determinations and legal conclusions of each of these holdings.  We begin our analysis, in this part, by reviewing Gore's claim that his statements were admitted in violation of his Fifth Amendment right to remain silent.  In part V, infra, we discuss Gore's claim that the admission of the statements violated his Fifth Amendment right to counsel.  Finally, in part VI, infra, we address Gore's Sixth Amendment claim.

## A.

Gore contends that his statements to Detective Simmons were obtained in violation of his rights under the Fifth Amendment to the United States Constitution.  The Fifth Amendment prohibits the admission at trial of compelled testimonial self-incriminating statements – inculpatory statements made to law enforcement while in custody – providing, in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.  Following the Supreme Court's decision in Miranda v. Arizona,

---

[56] None of the prior courts to address Gore's claim that his statements to Detective Simmons should have been suppressed have analyzed whether the admission of those statements was prejudicial to Gore.  Mindful that our review here is narrowly circumscribed, we do not engage in such analysis now.

44

384 U.S. 436, 467–68,  86 S. Ct. 1602, 1624–25, 16 L. Ed. 2d 694 (1966),[57] the

threshold Fifth Amendment admissibility inquiry has been: was the suspect given

a warning advising him of the now-familiar four Miranda rights – that the suspect

"'has the right to remain silent, that anything he says can be used against him in a

court of law, that he has the right to the presence of an attorney, and that if he

cannot afford an attorney one will be appointed for him prior to any questioning if

he so desires.'"  Dickerson, 530 U.S. at 435, 120 S. Ct. at 2331(quoting Miranda,

384 U.S. at 479, 86 S. Ct. at 1630).

Here, the trial court implicitly determined that the Metro-Dade police

followed the warning procedures delineated by Miranda.  Gore's argument for the

suppression of his statements, therefore, hinges less on Miranda, itself, than on its

progeny.  Gore submits that because he invoked his right to remain silent during

the initial questioning by the FBI, Miranda foreclosed his interrogation by

---

[57] It has long been recognized that the critical inquiry in applying this privilege against compelled self-incrimination is whether the inculpatory statements were made voluntarily, see Bram v. United States, 168 U.S. 532, 542–65, 18 S. Ct. 183, 187–95, 42 L. Ed. 568 (1897); cf. Dickerson v. United States, 530 U.S. 428, 432, 120 S. Ct. 2326, 2330–31, 147 L. Ed. 2d 405 (2000) (discussing the history of admitting inculpatory statements), but, prior to Miranda, courts engaged in a fact-intensive voluntariness inquiry, looking to the circumstances surrounding the statements.  See Malloy v. Hogan, 378 U.S. 1, 6–7, 84 S. Ct. 1489, 1493, 12 L. Ed. 2d 653 (1964) (noting some factors considered in determining if a confession was coerced); Bram, 168 U.S. at 561–64, 18 S. Ct. at 194–95 (assessing the voluntariness of the accused's statement in light of the circumstances surrounding it).  In Miranda, the Supreme Court abandoned this approach, in favor of  "concrete constitutional guidelines for law enforcement agencies and courts to follow."  Miranda, 384 U.S. at 442, 86 S. Ct. at 1611.

Detective Simmons.

B.

Miranda partially addressed the handling of an invocation of the right to remain silent by a properly-warned suspect, stating:

> [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

Miranda, 384 U.S. at 473–74, 86 S. Ct. at 1627–28. Under Miranda, therefore, all questioning must be immediately discontinued once a suspect indicates a desire to remain silent.

Agents McGuinty and Faust both testified that this is precisely what they did, and Gore presented no evidence to the contrary. Gore's statements to Detective Simmons would, therefore, only be inadmissible if an invocation of the right to remain silent precludes all future law enforcement questioning of a suspect. Miranda was silent on this issue, but the Supreme Court addressed it in Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), concluding "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right

46

to cut off questioning' was 'scrupulously honored.'" Id. at 104, 96 S. Ct. at 326.

Despite Miranda's stated preference for concrete guidelines, Miranda, 384 U.S. at 442, 86 S. Ct. 1611, the "scrupulously honored" standard articulated in Mosley has decidedly uncertain contours – while authorizing the resumption of questioning, it provides no clear guidance on the specific circumstances under which questioning may be resumed. What little guidance Mosley can provide on how to utilize "scrupulously honored" can be divined by looking to the factors the Court considered in determining that the post-invocation resumption of questioning was proper. The Mosley Court looked to four factors. First, the initial interrogation ended immediately once Mosley invoked his right to remain silent. Second, prior to the re-initiation of questioning, a substantial amount of time elapsed. Third, prior to the re-initiation of interrogation, Mosley was again read his rights. And, finally, once the interrogation resumed, Mosley was questioned by a different officer about an unrelated crime. Mosley, 423 U.S. at 104–07, 96 S. Ct. 321 at 327–28.

Similar factors have informed this court's analysis of post-invocation resumption of questioning by law enforcement. See Jacobs v. Singletary, 952 F.2d 1282, 1294–96 (11th Cir. 1992) (excluding certain statements because of repeated short-term re-initiated interrogations, while admitting another statement where

47

suspect initiated the discussion after a seven hour break from interrogation);

United States v. Nash, 910 F.2d 749, 752–53 (11th Cir. 1990) (holding post-invocation statements admissible where an hour had passed, the suspect had been re-read his rights, and evidence of who re-initiated discussions was disputed);

Jackson v. Dugger, 837 F.2d 1469, 1472 (11th Cir. 1998) (holding a six-hour period of non-interrogation sufficient and noting that repeated reading of the Miranda warnings was not coercive); United States v. Hernandez, 574 F.2d 1362, 1367–70 (5th Cir. 1978) (holding that re-reading of Miranda rights alone did not render the suspect's rights scrupulously honored where police continually resumed questioning after short periods of time and each resumption – prior to the last – was met with an invocation).[58]

## C.

The Florida Supreme Court used a footnote to dispose of Gore's argument that his invocation of the right to remain silent when the FBI had him in custody in Kentucky was fully operative when Metro-Dade Detective Simmons later questioned him in Miami. The court said this:

Gore did exercise his Fifth Amendment right to remain silent while

---

[58] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Id. at 1209.

being interrogated by federal officials. However, this did not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject." Michigan v. Mosley, 423 U.S. 96, 102–03, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313 (1975). The test for determining the voluntariness of statements made after the exercise of the right to remain silent is whether the right to cut off questioning has been "scrupulously honored." Id. at 104, 96 S. Ct. at 326. Gore's rights were so honored here. The FBI immediately stopped the interrogation when Gore said he did not want to answer further questions. Questioning by state officials took place seven days later, after Gore was again informed of his Miranda rights and waived them.

Gore v. State, 599 So. 2d at 981 n.5.

The "scrupulously honored" inquiry is a mixed question of fact and law. As an initial matter we note that the court correctly identified the controlling precedent – Mosley – and, as such, the decision falls outside 28 U.S.C. § 2254(d)(1)'s "contrary to" prong. See Williams v. Taylor, 529 U.S. 362, 406, 120 S. Ct. 1495, 1520, 146 L. Ed. 2d 389 (2000) (noting that "a run-of-the-mill state-court decision applying the correct legal rule" cannot be "contrary to" federal law). We are left, then, with two independent inquiries: whether the Florida Supreme Court's decision represents an unreasonable application of Supreme Court precedent, 28 U.S.C. § 2254(d)(1), i.e., whether the decision was objectively unreasonable, Williams, 529 U.S. at 406, 120 S. Ct. at 1520 (O'Connor, J., for the majority); and whether the decision resulted from an unreasonable determination

49

of the facts. 28 U.S.C. § 2254(d)(2).

We review Gore's factual challenge first. In concluding that Gore's Fifth Amendment right was scrupulously honored, the Florida Supreme Court, relying on the evidence adduced at the suppression hearing, found the following facts: (1) the FBI discontinued the initial interrogation when Gore invoked his right to remain silent, (2) there was a lag of seven days between interrogations, and (3) before Simmons began questioning Gore in Miami, Gore was re-advised of his rights under Miranda. Gore, 599 So. 2d at 981 n.5. At the hearing, Gore did not dispute the testimony establishing these facts. That is, Gore offered no evidence to contradict the FBI agents' description of what transpired when they questioned him. Nor did he dispute that there was a seven-day lag between the agents' questioning and Detective Simmons's interrogation. In fact, in testifying at the suppression hearing, Gore corroborated Detective Simmons's statement that he advised Gore of his Miranda rights. On these issues, the trial court was presented with virtually uncontested testimony from both sides that fit seamlessly together into a uniform account of events; we can hardly hold any findings of fact relying on that evidence "unreasonable . . . in light of the evidence[.]" 28 U.S.C. § 2254(d)(2).

Turning to Gore's challenge to the Florida Supreme Court's analysis of his

50

Fifth Amendment right to remain silence claim, we conclude that the court's treatment of this issue – though cursory – fell well within the bounds of reasonableness. The court's decision rested on many of the same factors that formed the basis for the Mosley decision. Here, as in Mosley, interrogation was immediately discontinued by the FBI in Kentucky once he invoked his right to silence. A substantial amount of time – nearly a week – passed before Gore was questioned by the Metro-Dade police. Before that occurred Gore was once again advised of his rights.

Gore contends that the absence of the final Mosley factor renders the Florida Supreme Court's decision an unreasonable application of law. Here, unlike in Mosley, when questioning was resumed, it arguably concerned the same underlying crimes as the initial interrogation.[59] Gore points to no decision of the United States Supreme Court holding either that all the factors considered in Mosley were necessary for a finding that a suspect's rights had been scrupulously honored, or that any single Mosley factor is necessary or sufficient in the

---

[59] Agents McGuinty and Faust were not aware of the specific state investigations in which Gore was a suspect. The record indicates, however, that they were aware that they were being dispatched to locate Gore not solely because he had violated his probation, but because he was a suspect in several crimes. Their ignorance of the specific crimes does not render their questioning unrelated to those crimes. The interrogation would hardly have been warranted for the probation violation alone. The obvious inference is that agents were seeking information about the other crimes.

51

"scrupulously honored" analysis. This court has always assessed, on a case-by-case basis, whether an accused's right to remain silent has been scrupulously honored. See Jackson v. Dugger, 837 F.2d 1469, 1472 (11th Cir. 1988). We have not held that the absence of a single Mosley factor is dispositive; rather, our inquiry looks to the circumstances as a whole. See, e.g., United States v. Nash, 910 F.2d 749, 752–53 (11th Cir. 1990) (holding post-invocation statements admissible where some of the Mosley factors were absent).

In finding that Gore's post-invocation right to remain silent had been scrupulously honored, the Florida Supreme Court relied on the three of the four Mosley factors. Thus, the court implicitly declined to extend United States Supreme Court precedent to require that the fourth Mosley factor – that the post-invocation resumption of questioning concern an unrelated crime – be present to "scrupulously honor" a suspect's right to remain silent. We conclude that this decision was not objectively unreasonable.

V.

We turn now to Gore's contention that his statements to Detective Simmons were admitted in violation of his Miranda-based Fifth Amendment right to

52

counsel.[60]

In <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the Supreme Court set forth a bright-line rule for questioning that takes place after an accused has requested counsel: following such a request for counsel, law enforcement may not resume questioning in counsel's absence.[61] <u>Id</u>. at 484–85, 101 S. Ct. at 1885 ("[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him[.]").[62] Following <u>Edwards</u>, absent a finding of waiver, if counsel is not present, any statement made following the request for counsel is presumed to be the result of coercion and is,

---

[60] The <u>Miranda</u> court noted that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." <u>Miranda</u>, 384 U.S. at 474, 86 S. Ct. at 1628.

[61] Concurring in the result in <u>Mosley</u>, Justice White noted the disparate treatments accorded an accused's invocation of the rights to remain silent and an accused's invocation of the right to counsel, observing that the procedural divergence was necessary because "the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto." <u>Mosley</u>, 423 U.S. at 110 n.2, 96 S. Ct. at 329 n.2 (White, J., concurring in result).

[62] Subject to waiver analysis, the <u>Edwards</u> rule may not apply, however, where it is the suspect who re-initiates the discussion in the absence of counsel. <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1044–47, 103 S. Ct. 2830, 2834–35, 77 L. Ed. 2d 405 (1983).

therefore, inadmissible. See Smith v. Illinois, 469 U.S. 91, 98–99, 105 S. Ct. 490, 494, 83 L. Ed. 2d 488 (1984) (holding that since all statements taken after a clear request for counsel are presumed to be the product of coercion those statements may not cast doubt on the clarity of the request). Unlike the Sixth Amendment right to counsel, the Fifth Amendment right to counsel is not offense-specific. Arizona v. Roberson, 486 U.S., 675, 685, 108 S. Ct. 2093, 2100, 100 L. Ed. 2d. 704 (1988). Statements taken after a resumption of questioning, even on the subject of an unrelated crime, are inadmissable under Edwards. Minnick v. Mississippi, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990).

B.

Of course, the Edwards regime is triggered by a request for counsel. See Smith, 469 U.S. at 98–99, 105 S. Ct. at 494. Absent a request for counsel – an indication to the police that the suspect wishes to interact with them through counsel alone – the Fifth Amendment right does not attach.

On this issue, we are presented with two arguments that Gore did invoke his Fifth Amendment right to counsel. Gore argues that he explicitly invoked his right to counsel and that, therefore, the Florida Supreme Court's conclusion that the trial court had not erred in finding that Gore had not done so represents an unreasonable factual determination. Second, Gore argues the Florida Supreme

54

Court erred in not holding that, as a matter of law, Gore's right to counsel was constructively invoked by the appointment of counsel to represent him at his hearing on the federal probation violation.

1.

Ordinarily, whether a suspect has invoked the right to counsel will be a factual determination. The trial court was presented with conflicting testimony. While Gore did not contest that he had not requested counsel during his initial FBI interrogation,[63] Gore did testify that he requested counsel while being interrogated by Detective Simmons. In contrast, Detective Simmons testified that Gore orally waived his Miranda rights and declined several offers to speak to counsel. Faced with a swearing match, the trial court made a credibility determination, albeit implicitly. The court chose to credit Detective Simmons's account of the interview. The Florida Supreme Court found that "there is no credible evidence that Gore ever asserted his Fifth Amendment right to counsel[.]" Gore v. State, 599 So. 2d 978, 982 (Fla. 1992).

We may disturb this finding only if it was "unreasonable . . . in light of the

_____

[63] Had Gore asserted his Fifth Amendment right to counsel while the FBI was questioning him in Kentucky, the intervening opportunity to consult with counsel would not have been sufficient to honor his right to counsel. In Minnick, the Supreme Court held that intervening consultation with counsel does not affect the bright-line rule of Edwards – a request for counsel under Miranda is a request to have counsel present at future interrogations. Minnick, 498 U.S. at 152–56, 111 S. Ct. at 490–92.

evidence[.]" 28 U.S.C. § 2254(d)(2). We cannot say that it was. A certain amount of deference is always given to a trial court's credibility determinations. See Fed. R. Civ. P. 52(a). That the case is before us on habeas review heightens that deference. See Rice v. Collins, 546 U.S. 333, ___, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006) (noting that credibility determinations are accorded even greater deference on habeas review).

Here, though, we need not rely exclusively on such deference to resolve the issue before us. The record supports the trial court's implicit determination that Gore waived his right to remain silent. Of particular importance is the fact that Gore does not contest that the interview with Detective Simmons extended from the afternoon throughout the evening. Instead, he argues that – despite the length of the period of questioning – he steadfastly requested a lawyer in the face of a seven-hour plus barrage of questions. Gore offers no explanation for why Detective Simmons continued to question him for hours beyond the point at which the effort must have seemed futile.

In light of the incongruity between the nearly undisputed length of the interrogation,[64] and Gore's account of the questioning, we could not possibly

---

[64] Detective Simmons testified that interrogation lasted seven hours, while Gore testified that it went on several hours beyond that.

56

conclude that the Florida Supreme Court's finding that Gore did not request counsel was unreasonable. As we noted, the Edwards exclusionary rule is triggered by the request for counsel. Here there was none. We cannot, therefore, see any basis for challenging the Florida Supreme Court's legal conclusion that Gore's Fifth Amendment right to counsel was violated.

## 2.

As he did before the Florida Supreme Court, Gore again argues that even if he did not explicitly invoke his right to counsel, the appointment of counsel during the hearing in federal court in Miami on the probation revocation charge, which was held shortly before he appeared before Detective Simmons for questioning, constructively invoked his right to counsel as a matter of law.[65] Gore argues that the appointment of counsel is the functional equivalent of an invocation under the Fifth Amendment, and, therefore, the absence of counsel during his later interrogation makes any statements he made there subject to suppression under Edwards.

The Florida Supreme Court addressed this argument, holding that "[T]he

---

[65] Gore did not rely on the fact that he was represented by counsel at appearances before federal magistrate judges while he was detained in Kentucky in arguing his case to the Florida Supreme Court on direct appeal. As we discussed in note 12, supra, very little about these appearances can be learned from the record before us.

57

fact that Gore had been advised by an attorney at some point in his time in custody

does not necessitate a finding that he invoked his Fifth Amendment right to

counsel." Gore, 599 So. 2d at 981. Gore argues that this holding is contrary to or

an unreasonable application of federal law. We disagree.

The fact that an accused is represented by counsel on an unrelated matter

does not automatically give rise to an assumption that the accused is asserting the

right to counsel in regard to all police questioning. See McNeil v. Wisconsin, 501

U.S. 171, 177–82, 111 S. Ct. 2204, 2208–11, 115 L. Ed. 2d 158 (1991). Thus, if

an accused is properly advised of the right to counsel under Miranda and non-

coercively, knowingly and intelligently waives that right, representation by

counsel on an unrelated matter will not taint that waiver and the statements are

admissible. Id.

The citationless short shrift given this issue by the Florida Supreme Court

notwithstanding, that court's decision was wholly in concert with federal

precedent. Gore's claim, therefore, falls well short of satisfying the exacting

standards for issuance of a writ of habeas corpus under 28 U.S.C. § 2254(d)(1).[66]

---

[66] In his briefs to this court, Gore presents an alternative Fifth Amendment right to counsel argument that was not presented to any of the courts that previously have considered this case. Gore points to his appointed assistant federal public defender's invocation of his Fifth Amendment rights at the hearing in Miami on the probation revocation charge. Gore's attorney requested that the magistrate judge issue an order forbidding all law enforcement authorities from questioning Gore in the absence of counsel, and, in the alternative, announced to the court that

58

VI.

The final issue before us is Gore's Sixth Amendment claim. Gore

challenges the Florida Supreme Court's decision holding that the admission of

Gore's statements to Detective Simmons did not violate his right to counsel under

the Sixth Amendment.

A.

The Sixth Amendment provides, in relevant part that "In all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of

Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to

counsel serves a purpose distinct from that of the similar Fifth Amendment right.

"It embodies a realistic recognition of the obvious truth that the average defendant

---

Gore wished to invoke his rights under the Fifth Amendment. We set forth the precise language employed by Gore's counsel in note 13, supra. Gore argues that his statements to Detective Simmons were made after that invocation, and thus should have been suppressed under Edwards.

As far as we can tell from the record, Gore's brief to us contains the first mention of the invocation of his Fifth Amendment rights at that hearing. In fact, Gore was not in possession of the transcript of the hearing, on which this argument relies, when he filed his initial brief in this appeal. As noted earlier, he appended the transcript to his reply brief.

Our task on federal habeas review is to determine not whether a state court's factual and legal determinations were correct, but rather, to determine whether they were reasonable. 28 U.S.C. § 2254(d). We are at a loss to explain how we could possibly conclude that the Florida Supreme Court's findings were unreasonable on the basis of evidence never presented to that court. See Miller-El v. Dretke, 545 U.S. 231, 257 n.15, 125 S. Ct. 2317, 2335 n. 15, 162 L. Ed. 2d 196 (2005) (noting that material first presented to a court on federal habeas review is not helpful in determining if state court decisions were reasonable at the time they were made). The Florida Supreme Court's determination was reasonable in light of the record before it. Our power to review its decision ends there.

does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel." Johnson v. Zerbst, 304 U.S. 458, 462–63, 58 S. Ct. 1019, 1022, 82 L. Ed. 1461 (1938).

The Sixth Amendment guarantee does not assure only that accused will be assisted by counsel at trial; defendants are "as much entitled to such aid during [the pre-trial] period as at the trial itself." Powell, 287 U.S. at 57, 53 S. Ct. at 60. An accused's Sixth Amendment right to counsel attaches at the initiation of formal criminal proceedings.[67] United States v. Gouveia, 467 U.S. 180, 187–93, 104 S. Ct. 2292, 2297–00, 81 L. Ed. 2d 146 (1984) (recognizing that "the right to counsel does not attach until the initiation of adversary judicial proceedings"); Kirby v. Illinois, 406 U.S. 682, 687–90, 92 S. Ct. 1877, 1881–83, 32 L. Ed. 2d 411 (1972).

A concomitant of the right to the assistance of counsel is the right to have counsel present during questioning regarding crimes to which the right has attached. See Michigan v. Jackson, 475 U.S. 625, 632, 106 S. Ct. 1404, 1408, 89 L. Ed. 2d 631 (1986) (noting that the Sixth Amendment secures for the accused

---

[67] At its root, the guarantee protects the layperson – likely ignorant in the ways of the law – who is confronted by prosecutorial expertise and the sometimes Rube Goldbergian intricacies of the legal system. See Ash, 413 U.S. at 306–10, 93 S. Ct. at 2572–74. This purpose would not be served if counsel were denied to a defendant at any formal proceeding that would render a future trial a "mere formality." See United States v. Wade, 388 U.S. 218, 224–25, 87 S. Ct. 1926, 1930–31, 18 L. Ed. 2d 1149 (1967).

60

"the right to rely on counsel as a 'medium' between him and the State" (internal quotations removed)); Maine v. Moulton, 474 U.S. 159, 170–71, 106 S. Ct. 477, 484, 88 L. Ed. 2d 481 (1985) ("Once the right to counsel has attached and been asserted, the State must of course honor it[, which] means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel."). Following the initiation of formal proceedings against an accused, therefore, any statement made by the accused in the absence of counsel may not be admitted at trial.[68] See Fellers v. United States, 540 U.S. 519, 523, 124 S. Ct. 1019, 1022, 157 L. Ed. 2d 1016 (2004) ("[A]n accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which [law enforcement] agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." (quoting Massiah, 377 U.S. at 206, 84 S. Ct. at 1203)).

Unlike the Fifth Amendment right, the Sixth Amendment right to counsel is offense-specific. McNeil v. Wisconsin, 501 U.S. 171, 175–80, 111 S. Ct. 2204, 2207–10, 115 L. Ed. 2d 158 (1991). The right does not attach to uncharged

---

[68] If, however, the accused is not represented and has not requested counsel, an advisement of Miranda rights is sufficient to safeguard the Sixth Amendment right, and any statement given following such advice of rights will be presumed to be the product of a voluntary waiver. Patterson v. Illinois, 487 U.S. 285, 290–97, 108 S. Ct. 2389, 2393–97, 101 L. Ed. 2d 261 (1988).

crimes, even if those crimes are factually related to the crime for which formal

proceedings have been initiated.  Texas v. Cobb, 532 U.S. 162, 121 S. Ct. 1335,

149 L. Ed. 2d 321 (2001).

B.

 The Florida Supreme Court said this about Gore's Sixth Amendment claim:

> While there is no credible evidence that Gore ever asserted his
> Fifth Amendment right to counsel, there is evidence that he asserted
> his Sixth Amendment right to counsel as to the federal charges.
> Before being questioned by state officials in Miami, Gore was
> brought before a federal magistrate. At this time, counsel was
> evidently appointed to represent him in the federal proceedings. Gore
> contends that because he was unquestionably represented by counsel,
> the police were prohibited from further interrogating him. However,
> the appointment of Sixth Amendment counsel is very different from a
> request for Fifth Amendment counsel to assist in police
> interrogations.

Gore, 599 So. 2d at 982.  After discussing the relevant precedent, the court went

on to conclude:

> We reject Gore's argument that this Court should not follow
> McNeil. We believe that the holding adopted by the Supreme Court in
> McNeil adequately protects the right to counsel, while at the same
> time recognizing that there is a difference between the appointment of
> counsel at a preliminary hearing such as first appearance and a
> request for counsel to assist in police interrogations, a difference
> which is also present under the Florida Constitution. See Traylor v.
> State, 596 So. 2d 957 (1992). Making the appointment of Sixth
> Amendment counsel the equivalent of a request for Fifth Amendment
> counsel would mean that the police could not question persons in
> custody about any offense once they have had some preliminary

62

hearing at which Sixth Amendment counsel is routinely granted.

....

The preclusion of interrogation in these situations is simply not mandated by the Constitution. Accordingly, finding no violation of Gore's rights under either the Fifth or the Sixth Amendment, we reject Gore's claim that the trial court erred in denying his motion to suppress.

Id. at 982–83.

As with Gore's Fifth Amendment challenge, we may easily dispose of the contention that the Florida Supreme Court's ruling on Gore's Sixth Amendment claim was "contrary to" established Supreme Court precedent. The court correctly identified the governing precedent. The court cited the Supreme Court's decision in McNeil v. Wisconsin, 501 U.S. 171, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991), and quoted from it liberally while tracking its reasoning. Gore, 599 So. 2d at 982–83. In McNeil, Paul McNeil had been arrested for armed robbery and an attorney from the Wisconsin Public Defender's Office had been appointed to represent him on that charge. McNeil, 501 U.S. at 173, 111 S. Ct. at 2206. While McNeil was being held on the armed robbery charge, he was approached on several occasions by police, who – after advising him each time of his Miranda rights – questioned him about an unrelated crime to which McNeil eventually confessed. Id. at 173–74, 111 S. Ct. at 2206–07. The Supreme Court ruled that

63

McNeil's inculpatory statements were admissible, holding that McNeil had waived

his right to counsel because the Sixth Amendment right to counsel is specific to

the charged offense.  Id. at 175–82, 111 S. Ct. at 2207–11.[69]

The facts here are similar to those confronted by the Supreme Court in

McNeil.  Gore was arrested pursuant to a warrant issued for violating the terms of

his federal probation.  In his initial appearance on that allegation, the court

appointed an attorney to represent him.  Later, the Metro-Dade police questioned

him regarding unrelated charges.[70]  Prior to this questioning, Gore was advised of

his right to counsel, and he waived it.  Statements he made during the ensuing

interrogation were admitted against him at trial.  Given the similarity of these

circumstances and those in McNeil, we cannot hold that the Florida Supreme

Court's decision was "contrary to" federal law.  See  Williams v. Taylor, 529 U.S.

362, 406, 120 S. Ct. 1495, 1520, 146 L. Ed. 2d 389 (2000).

---

[69] The court also held that McNeil's waiver of the right to counsel could not presumed invalid because he had not invoked his Fifth Amendment right to counsel – denying him the benefit of the Edwards rule – and because the Sixth Amendment right is offense-specific – denying him the benefit of the extension of the Edwards bright-line rule to the Sixth Amendment context of Michigan v. Jackson, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986). McNeil, 501 U.S. at 175–82, 111 S. Ct. at 2207–11.

[70] While Gore's interrogation in Kentucky by agents McGuinty and Faust arguably touched upon issues related to the later state charges filed against Gore, the specific offense for which Gore was detained was the violation of the conditions of his federal probation.  In conducting Sixth Amendment analysis, we look to the charged offense.  Here, the charged offense was unrelated to the later state charges.

C.

We are left, then, to inquire whether the Florida Supreme Court's decision represents an "unreasonable application" of federal law. 28 U.S.C. § 2254(d)(1). Gore advances a variety of arguments in contending that the trial court's denial of his motion to suppress and the Florida Supreme Court affirmance infringed his Sixth Amendment right to counsel.

Gore was questioned in Miami by Detective Simmons on March 24, 1988. Formal charges for the robbery, kidnapping and murder of Susan Roark were not brought until he was indicted by a Columbia County grand jury on April 25, 1989. Thus, as the Florida Supreme Court held, under McNeil, Gore's offense-specific Sixth Amendment right to counsel for the murder of Roark did not attach until more than a year after Simmons's interrogation took place. Gore nevertheless argues that, in failing to exclude the statements, the Florida Supreme Court unreasonably declined to extend Supreme Court precedent into new contexts. See Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092 (11th Cir. 2007) (citing Williams, 529 U.S. at 407, 120 S. Ct. at 1520 (O'Connor, J., for the majority)).

1.

Gore first argues that his statements to Detective Simmons should have been suppressed because Detective Simmons interrogated him regarding Susan

65

Roark's disappearance.  Gore relies on the essentially pretextual nature of the federal charges for which he was arrested in Kentucky, and the fact that the federal kidnapping charge was dropped in deference to state charges, in an attempt to conflate the federal and state custody and charges into a single, inseparable factual whole.  In Gore's view, the federal probation violation warrant was used as a pretext to arrest him in Kentucky for crimes committed in Florida.  Because the federal arrest was a pretext, Gore continues, he was actually arrested for the state crimes.  Then, according to Gore, on the appointment of counsel by the federal magistrate judge, the Sixth Amendment right attached to the state charges as well.

Gore's argument is impossible to square with clear precedent establishing formal charges as the trigger of the Sixth Amendment right to counsel.  Gouveia, 467 U.S. at 187–93, 104 S. Ct. at 2297–00.  Gore was questioned by Detective Simmons more than a year prior to the first formal proceedings related to the Roark murder.  The questioning was the sort of routine police investigation not reached by the protections of the Sixth Amendment.  Kirby, 406 U.S. at 687–90, 92 S. Ct. at 1881–83.  Though Gore's right to counsel had been triggered by the probation violation charge, his argument that other crimes must be included in this right to counsel is foreclosed by the offense-specific nature of the Sixth

66

Amendment right.[71]  McNeil, 501 U.S. at 175–82, 111 S. Ct. at 2207–11.  At the

time of Gore's interrogation by Detective Simmons, Susan Roark's body had not

yet been found.  Formal charges for the robbery, kidnapping and murder of Susan

Roark were not brought until more than a year after the questioning took place.[72]

Any attempt to compress the federal arrests and charges with these those contained

---

[71] It is certainly the case that the federal and state authorities worked together to apprehend Gore.  This cooperation led to Gore's arrest in Kentucky; the questioning there by agents of the FBI; the hearing before the magistrate judge in Miami at which the assistant U.S. Attorney dismissed the kidnapping charge (involving Tina Corolis's son) and consented to Gore being handed over to the Metro-Dade police; and, finally, Detective Simmons's interrogation which included questions about Susan Roark's disappearance and her black Mustang.  Gore's problem is that this seeming unity of federal and state pursuit of a suspect does not unify the substantive underlying crimes.

[72] In an apparent attempt to paper over the gap in time between Gore's questioning by Detective Simmons and the return of the indictment in Columbia County for the murder of Roark, Gore, in his brief to this court, continually engages in a sort of factual legerdemain, conflating the charges for the Corolis assault with those involving Susan Roark.  For example, Gore argues that the decision to drop the federal charges "essentially served to make the secondary state charges, the primary underlying motive for his arrest, the charges for which his 6th amendment rights should have attached."  While misstating the record – the federal kidnapping charge was dropped, the probation violation charge was not – this statement implies that the federal charges were dropped for pending "secondary state charges."  Indeed, the federal kidnapping charge was dropped in deference to pending state charges, but the pending state charges were not those before us now.  Those state charges involved the attempted murder of Tina Corolis and her son.  A warrant for Gore's arrest on those charges had been issued two days before the assistant U.S. Attorney dropped the federal kidnapping charge during the hearing on the probation violation matter.  Gore apparently either hopes that we will miss the distinction between the two crimes, or his true purpose here is collaterally to attack his conviction in the Corolis case.  At the time Detective Simmons questioned him, Gore was certainly a suspect in Susan Roark's disappearance – Simmons did ask Gore several questions about Roark – but he had not, and probably could not, have been charged with her murder.

67

in the Roark case for Sixth Amendment purposes ultimately fails.[73]

2.

Gore next argues that his Sixth Amendment right to counsel was violated

_____

[73] In his brief to this court, Gore for the first time attempts to circumvent the rule of McNeil by pointing to language in decisions by our sister circuits that indicates that an exception to the offense-specific rule may exist for uncharged crimes that are inextricably intertwined with charged crimes. See United States v. Hines, 963 F.2d 255, 257–58 (9th Cir. 1992); United States v. Cooper, 949 F.2d 737, 743–44 (5th Cir. 1991). This argument is unavailing for a variety of reasons. Gore's reliance on these decisions is questionable at best. In both Hines and Cooper, the courts were confronted with crimes far more factually intertwined than the charges in the Roark case, yet in both decisions the courts rejected the accused's argument that the crimes were inextricably intertwined. Hines, 963 F.2d at 255–57 (holding that similar crimes were logically distinct when "the place time and persons involved were all different" Id. at 257); Cooper, 949 F.2d at 743–44 (holding that a federal weapons charge was not inextricably intertwined with a state armed robbery charge where the weapon from the federal crime was used in the state crime).

Moreover, after the Florida Supreme Court decision issued – and after both Hines and Cooper were handed down – the United States Supreme Court addressed the correct standard to be used in analyzing whether the Sixth Amendment right to counsel attaches to factually similar crimes. In Texas v. Cobb, 532 U.S. 162, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001), the Supreme Court held that mere factual similarity between a charged and uncharged crime was insufficient to trigger an accused's Sixth Amendment right in relation to the uncharged crime. Id. at 169–73, 121 S. Ct. at 1342–44. Instead, the Court imported – from Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932) – into the Sixth Amendment context, the standard used in determining whether separate charges based on similar acts violate the Fifth Amendment's Double Jeopardy clause. The Court held that where an accused's Sixth Amendment right to counsel has attached to one crime, it does not attach to an uncharged crime unless that crime has elements identical to those of the charged crime and would require proof of no additional facts. Id.

Cobb is dispositive here. Gore's Sixth Amendment right attached to the subsequently-dropped federal kidnapping charge and to the charge that he violated the conditions of his federal probation. These charges were sufficiently distinct from the charges of murder, kidnapping, and robbery contained in the Roark indictment that the Blockburger test would not be satisfied. Under Cobb, therefore, Gore's Sixth Amendment right to counsel did not attach to the Roark crimes when he was formally charged with, and appointed counsel for, the federal probation violation. We cannot hold that a state court unreasonably failed to extend Supreme Court precedent to a place where the Supreme Court explicitly declined to go.

when law enforcement continued to interrogate him in violation of the court order allowing the public defender Judy Alves to consult with him. Gore contends that the Metro-Dade police deceived Alves and denied her access to Gore in violation of a court order, and that the twin force of this deception and violation amounted to governmental interference with, at least, the spirit of the right to counsel.

Gore's contention fails both as a matter of fact and as a matter of law. First, it is not at all clear from the record that the court order was ever violated or that Alves was ever actively deceived. Alves testified that the order granted her access to Gore <u>at the Dade County jail</u>. During the entire time she unsuccessfully sought to gain access to Gore, Gore was not being held at the jail. Instead, he was in the Homicide Bureau of the Metro-Dade police headquarters. When Alves sought access to Gore in the jail, she was truthfully told that he was not there. When she returned to the circuit judge who had issued the order to complain that the jailors were not honoring the order, an assistant state attorney informed the court that Gore was not currently being held in the jail.[74] The court concluded, therefore, that the order had not been violated.[75] Alves then went to the Metro-

---

[74] The assistant state attorney incorrectly informed the court that Gore had not yet been brought to Metro-Dade police headquarters.

[75] The court also indicated that the intent of the order had been to ensure that Alves's effort to contact Gore was not frustrated by correctional officers failing to comply with statutory procedures. The court clearly did not intend the order to be used to disrupt an ongoing police

Dade police headquarters, and after an initial delay, was told that Gore was there but that she could not see him. It is difficult to see how honesty and compliance with a court order run contrary to the spirit of the Sixth Amendment.

Even were we to accept Gore's assertion that Alves was deceived and that the court order that she had obtained was violated, Gore can point to no established precedent to support his argument that this deception constituted an unconstitutional deprivation of counsel. He does, however, identify and try to distinguish the decision which is fatal to his argument, Moran v. Burbine, 475 U.S. 412, 428–32, 106 S. Ct. 1135, 1144–47, 89 L. Ed. 2d 410 (1986). In Moran, following the arrest of the accused, Brian Burbine, Burbine's sister had hired an attorney on his behalf; the attorney then phoned the police and requested to be present should Burbine undergo questioning. Id. at 417, 106 S. Ct. at 1138–39. The police informed the attorney that they did not intend to question Burbine, before proceeding to do so and eliciting inculpatory statements. Id. Burbine conceded at the time of the questioning that he had not been formally charged and, therefore, under traditional Sixth Amendment analysis, his right to counsel had not attached. Id. at 428–29, 106 S. Ct. 1144–45. He asked the Court to recognize a "right to noninterference with an attorney's dealings with a criminal suspect [that]

interrogation.

arises the moment that the relationship is formed[.]" Id. at 429, 106 S. Ct. at 1145. Noting that it was not supported by precedent, the Court found Burbine's argument "both practically and theoretically unsound." Id. at 430, 106 S. Ct. 1145. Reasoning that the Sixth Amendment was not intended to protect the attorney-client relationship, the Court re-affirmed that the Sixth Amendment "becomes applicable only when the government's role shifts from investigation to accusation." Id. at 430, 106 S. Ct. at 1146.

Gore's argument essentially mirrors that rejected by the Supreme Court in Moran. It relies on a non-existent Sixth Amendment principle of non-interference. This case is materially indistinguishable from Moran – neither Burbine nor Gore was formally charged with the subject crime for which the interrogation was being conducted; neither Burbine nor Gore had requested counsel. Moran thus controls here. We cannot conclude that the Florida Supreme Court's decision represented an unreasonable application of federal law because it failed to extend current Sixth Amendment jurisprudence to embrace a principle of non-interference with the attorney-client relationship.

3.

Gore's final Sixth Amendment argument is that the two hearings before the circuit judge – in which Alves obtained and then sought enforcement of an order

71

allowing her to see Gore – qualified as the initiation of formal adversary proceedings against him, thereby triggering his right to counsel. See Gouveia, 467 U.S. at 187, 104 S. Ct. at 2297 ( "[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him."). In Gore's view, the Metro-Dade interrogation accordingly operated to deny Gore's right to counsel.[76]

We need not reach this novel argument. On March 24, 1988 – the day that the interrogation by Detective Simmons and the Alves hearings before the circuit judge took place – Gore was in custody in Miami pursuant to an arrest warrant issued on March 22 for the assault and attempted murder of Tina Corolis. As we have already observed, the Sixth Amendment right to counsel is offense-specific. McNeil, 501 U.S. at 175–80, 111 S. Ct. at 2207–10. Thus, even if we were to hold both that Gore did not waive his right to counsel when questioned by Simmons and that the Alves hearings triggered his right to counsel, it still would not be his right to counsel for the murder of Susan Roark that would have been triggered. What may have been triggered was his Sixth Amendment right to counsel on the

---

[76] Detective Simmons testified that the statements at issue were not elicited until the evening session of questioning. As such, the statements were likely taken after both hearings in the circuit court had occurred.

Corolis charges.[77]

The Florida Supreme Court, applying relevant United States Supreme Court precedent, concluded that the admission at trial of Gore's statements to Detective Simmons did not infringe Gore's right to counsel under the Sixth Amendment. Gore has failed to show that this conclusion was either contrary to or an unreasonable application of clearly established federal law. He has therefore failed to carry his burden, under 28 U.S.C. § 2254(d)(1), of demonstrating that habeas relief is appropriate.

VII.

In a well-reasoned and thoroughgoing opinion, the Florida Supreme Court concluded, among many other things, that the trial court did not deny Gore his Fifth and Sixth Amendment rights when it admitted into evidence statements Gore made to Detective Simmons. Gore v. State, 599 So. 2d at 980–83. The district court held that "the Florida Supreme Court's decision with respect to this issue was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the

---

[77] As we intimated earlier, a desire collaterally to attack the convictions in the Corolis case seems to inform many of Gore's arguments in this appeal.

73

state court proceedings." <u>Gore v. Crosby</u>, No. 3:03-cv-474 (M.D. Fla. Jan. 31, 2006) (unpublished order). For the reasons we have expressed in this opinion, we agree. The district court's judgment is, accordingly,

AFFIRMED.